Woodrow W. CAPE, Petitioner,

v.

UNITED STATES of America, Respondent.

No. 16471.

United States Court of Appeals Ninth Circuit.

Oct. 6, 1960.

R. Max Etter, Spokane, Wash., for appellant.

Dale M. Green, U. S. Atty., Spokane, Wash., for appellee.

Before MAGRUDER, HAMLIN and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

This is an appeal by Woodrow W. Cape from a judgment of conviction under the Hobbs Anti-Racketeering Act, 18 U.S. C.A. § 1951. The indictment was in two counts: the first charged appellant with extorting $1,000 from A. J. Curtis and Ben Mapes, agents of certain corporations engaged in pipeline construction in interstate commerce; the second charged him with extortion by attempting to obtain an automobile from A. J. Curtis; both counts alleged that appellant accomplished the extortion with consent of the victims " * * * by wrongful use of actual and threatened force, violence, and fear * * *." The jury acquitted Cape of the second count, but found him guilty of the first; he was sentenced to one year imprisonment. We have jurisdiction under 28 U.S.C.A. §§ 1291 and 1294.

There are two primary grounds for reversal urged on this appeal: (1) that the District Court erred by refusing to grant the appellant's timely motions for judgment of acquittal when the evidence was and is insufficient to support a verdict of guilty, and (2) that the court committed prejudicial error by admitting in evidence a tape recording of a conversation between appellant and A. J. Curtis when portions of it were inaudible and unintelligible.[1]

The evidence adduced at the trial shows that appellant was a business agent and employee representative of Local 598, Plumbers and Steamfitters Labor Union (A.F.L.), at Pasco, Washington; he supplied skilled and unskilled laborers to various pipeline construction companies in the area and adjusted labor disputes over working conditions with particular employers. In February,

1956, the Curtis Construction Company through its owner, A. J. Curtis, obtained a contract with Pacific Northwest Pipeline Company to construct a pipeline distribution and connection system for natural gas, linking the cities of Pasco and Kennewick in the State of Washington with Pacific Northwest's interstate pipeline, then under construction, extending from New Mexico throughout the Northwest. Curtis also obtained separate construction contracts for other phases of the pipeline system in Washington as well as Idaho and Colorado; we are concerned here only with the contract in the Pasco-Kennewick area.

To accomplish the pipeline construction, Curtis formed two additional corporations, the C.B.C. Construction Company, Inc., and Cascade Constructors, Inc.; he transported equipment valued in excess of $300,000 from central offices in Casper, Wyoming to the State of Washington. Appellant, as business agent of Local 598, furnished Curtis with the employees required in the "lineup and welders gang"; their job was to lay and weld pipe after a right-of-way and ditch had been cleared.

The heart of the government's case is centered upon the testimony of Curtis and O. F. Bradford, the superintendent in charge of the Pasco-Kennewick project. Curtis testified that he estimated the job would require ten men, five skilled and five unskilled, in the lineup and welders gang, that they would lay 2,000–3,000 feet of pipe per day, and that the project would be completed in 120 days. He further testified, however, that Cape required him to use sixteen men, all skilled, that the crew averaged only 500–700 feet per day, that the job took over six months to

---

1. Appellant recites several other points as error in his brief: (1) admitting incompetent, irrelevant and prejudicial testimony, (2) excluding testimony of certain defense witnesses, and (3) permitting improper questions and arguments by goverment counsel. However, he does not indicate what the admitted or rejected evidence was, nor where in the transcript such errors appear, and he does not argue the points at all in his brief. Appellant has therefore not complied with Rule 18, subd. 2(d) of this court, 28 U.S.C.A. and we are not required to consider these specifications of error. Cakmar v. Hoy, 9 Cir., 1959, 265 F.2d 59. We have considered the record most carefully, however, and our search has failed to disclose any such errors or that appellant was in any way prejudiced by evidentiary rulings of the court or statements by government counsel.

complete, and that at one point the corporations were losing $2,500 per day. The total loss finally suffered was $150,000.

The major factor, according to Curtis and Bradford, in causing the slow progress on the job was the inefficiency of the workers. Curtis testified that "[t]hey just wouldn't work," and after approximately two weeks of construction, some of them were fired, but Cape informed Curtis that unless these men were rehired no one would work.

Curtis discussed these problems several times with Cape. On one occasion, during the latter part of April, 1956, Curtis stated that he asked Cape what could be done to alleviate the problems he was having; Cape replied that if he received an automobile, Curtis would cease "having troubles" and would be permitted to bring in some of his own specialists to complete the work on the project.

Shortly afterward a meeting was arranged at Curtis' apartment, and at his suggestion, to further discuss the matter; Cape, Curtis and Bradford were present. Curtis had prepared for this meeting by concealing a small wire recording machine, capable of being lodged on his person unnoticed, and proceeded to record the conversation which ensued. Curtis testified, and his recollection is supported by Bradford's testimony, that he again asked Cape what could be done to halt the "slow-ups" and other troubles on the job; Cape again replied that if Curtis bought him an automobile, a "Ford," before the job was half-completed, the trouble would cease. Curtis and Bradford both testified that Cape had explained the troubles other contractors had had: sugar placed in the gas tanks of their vehicles, equipment found in the bottom of Columbia River, tractors blown up, and other machines simply not operating at all. Curtis testified that he agreed to buy the car for Cape because he

was fearful of economic loss on the job and loss or damage to his equipment.

Curtis also stated that he had another meeting with Cape at a restaurant called "Frank's Bar and Grill" in Pasco, Washington during the early part of July, 1956. The automobile was discussed again and Cape "wanted something done about it"; in answer to Curtis' inquiry regarding cost, Cape stated that he could purchase an automobile for $3,600. Curtis testified that he agreed to meet Cape at the Black Angus Motel at 4 P.M. on the same day and pay $800 of the total amount; he then obtained the money from his corporation by check, and after cashing it, turned the money over to Cape in front of the Black Angus Motel; no one else was present. Curtis stated that after this payment the progress on the job improved somewhat and he was allowed to employ two or three of his own specialists at the Pasco-Kennewick job site.

The next meeting, according to Curtis, occurred at the American Legion Club in Pasco where Curtis was eating dinner with Ben Mapes, an employee of the company. Cape approached their table and informed Curtis that he needed $200 by the next morning. Curtis stated that he was leaving town but instructed Mapes to obtain the money and give it to Cape. Mapes testified that he arranged to meet Cape at 11:30 A.M. the next morning at Frank's Bar and Grill; at 9:00 A.M. the next day he obtained a $200.00 check from the corporation's "office man", Mr. Bieghle, cashed it, and handed the money to Cape at "Frank's".

Curtis testified that he met Cape again after the job had been completed, sometime in the fall of 1957. Cape had phoned him in Ontario, Oregon, from Casper, Wyoming and stated that he wanted to return the $1,000,[2] Curtis was then de-

**2.** Cape was running for the office of business agent of Local 598; he was apparently having difficulties in the campaign because of his previous dealings with Curtis. In September, 1957 he requested Curtis by telephone to send him a

telegram stating that their relationship had been "upright, honest and beyond reproach," blaming his superiors for any troubles which had occurred. The telegram sent by Curtis read as follows:
"Confirming our conversation of this

parting for Casper by airplane; when he arrived, Cape was waiting at the airport with one Raymond Ridders, a pipefitter. Cape offered, and Curtis accepted, the money, but Curtis returned $200 to Cape in order to make the return trip home. Curtis at that time signed a statement prepared by Cape to the effect that Cape had not received any personal gain in their dealings.

Cape testified in his own behalf: he denied causing trouble or making threats of any kind; he denied receiving any money from either Curtis or Mapes; he stated that he drank a considerable amount of liquor before and during the meeting in Curtis' apartment and could not remember much of the conversation; he did recall that Curtis had once offered to give him an automobile at Frank's Bar and Grill, and Bradford later mentioned the offer to him, but asserted that nothing further was said or done about it.

There was other testimony on behalf of Cape by three employees of the company, who explained that there were no "slow-downs" on the Pasco-Kennewick project and that the delays were due to striking rock and water mains, as well as the lack of a sufficient ditch to lay the pipeline. This testimony was controverted not only by Curtis and Bradford, but by William E. Hansen, City Manager of Kennewick, who testified that from his observation of the work in the Kennewick area "there would be men standing around, and it looked like the whole job was feather-bedded."

■ The appellant's first contention raises a question of the sufficiency of the above evidence, which is both direct and circumstantial. We must view this evidence in the light most favorable to the government, including the reasonable inferences to be drawn therefrom. Schino v. United States, 9 Cir., 1954, 209 F.2d 67. We are guided by the following rule:

"The test to be applied on motion for judgment of acquittal in such a case, however, is not whether in the trial court's opinion the evidence fails to exclude every hypothesis but that of guilt, but rather whether *as a matter of law* reasonable minds, as triers of the fact, *must* be in agreement that reasonable hypotheses other than guilt could be drawn from the evidence. * * * If reasonable minds *could* find that the evidence excludes every reasonable hypothesis but that of guilt, the question is one of fact and must be submitted to the jury."

Remmer v. United States, 9 Cir., 1953, 205 F.2d 277, 287; see also, Stoppelli v. United States, 9 Cir., 1950, 183 F.2d 391.

■ We believe that from the evidence presented here reasonable minds could exclude every reasonable hypothesis but that of guilt. The evidence was largely testimonial and squarely in conflict; the jury could, as it eventually did, believe the story of extortion as unfolded by the testimony of Curtis and Bradford. That story, in essence, disclosed that appellant had caused Curtis considerable labor troubles in the early part of the construction; Cape clearly indicated that these troubles would end if he received an automboile and at the same time mentioned the destruction and damage to the equipment of other contractors who had come into the area. It could be reasonably inferred from this testimony that Cape threatened to use the same methods against Curtis if he did not receive the automobile. Thus, the fear of economic loss was not only real, but sufficiently compelling to require Curtis to comply with Cape's demands by payments totalling $1,000.

■■ Since the lower court was correct in submitting the case to the jury, their decision is normally binding under the usual rule that the verdict is final if supported by substantial evidence. See

date in which I was advised by you that you were working under orders of Mr. Beams as business agent during our construction in the town of Pasco and Ken-

newick in 1956. If this be the case Mr. Beams should certainly be removed from office."

Elwert v. United States, 9 Cir., 1956, 231 F.2d 928; Stoppelli v. United States, supra. The basic facts recited above, coupled with the inherent credibility resolution by the jury against appellant in favor of Curtis and Bradford, fully and substantially support the guilty verdict.[3]

Appellant nevertheless argues that the government has not sustained its burden of establishing extortion by consent of the victim " * * * induced by wrongful use of actual or threatened force, violence, or fear * * *," as required by 18 U.S.C.A. § 1951(b) (2). He maintains that there was no evidence of threatened force or violence on his part, nor a rational fear of economic loss on Curtis' part. He cites Curtis' testimony to the effect that the latter had no personal fear of appellant, but merely expressed a "late and weak off-hand concern" for his equipment.

The answer to this argument is that the evidence presented sufficient facts from which it could reasonably be inferred that Cape actually threatened "trouble" and possible force or violence, and that as a result Curtis was placed in reasonable fear not only of loss or damage to $300,000 worth of equipment, but of continuing economic loss as well (he in fact lost $150,000). A reasonable fear of the latter type alone is clearly sufficient to support a conviction of "extortion" under the statute. See Bianchi v. United States, 8 Cir., 1955, 219 F.2d 182; Callanan v. United States, 8 Cir., 1955, 223 F.2d 171. We agree with Judge Medina's reasoning in a similar case, which is controlling here:

" * * * appellant's argument is merely a variant of contentions we hear so often in extortion cases to the effect that, unless the threat which induces fear in the victim is spelled out in words of one syllable and in plain terms of a threat, there is no case for the jury. But common sense must be used in this class of cases as well as others. If the jury believed [the employer's] testimony of what appellant said to him, it was certainly within their province to infer that appellant intended to give [the employer] the impression that he was faced with the practical certainty that appellant would picket the job site and cause work stoppage if [the employer] did not accede to his demands. When appellant said 'there would be no trouble' on the job if [the employer] paid up, the jury had a right to infer that, if [the employer] did not pay up, there would be 'trouble' * * *." United ed States v. Palmiotti, 2 Cir., 1958, 254 F.2d 491, 495.

Appellant's second contention, concerning the admission into evidence of the wire recording, is equally without merit. There were three such recordings offered in evidence by the government: the first (Pl.Ex. No. 6) was admitted without objection; the second (Pl.Ex. No. 7) was rejected as unaudible; the third (Pl.Ex. No. 8), and the one at issue, was admitted over appellant's objection. The conversation recorded was between Cape, Bradford and Curtis at the latter's apartment in April, 1956. A proper foundation was laid for its admission by showing that the machine was attached to a tape recorder and re-recorded for better sound projection. It was first played before court and counsel outside the presence of the jury: parts of the recording were found by the court to be inaudible while others were found to be clearly intelligible. The court admitted the recording for purposes of corroborating the testimony of Curtis and Bradford concerning the purported conversation as well as providing background information. Extensive cautionary instructions were twice given to the jury concerning the weight to be given the recording because of its inaudible portions, once

---

3. Both parties concede, and it is apparent from the record, that the Curtis corporations were engaged in interstate commerce; the extortion from these corporations, then, would result in obstructing, delaying or affecting commerce within the purview of 18 U.S.C.A. § 1951.

**435**

prior to its initial playing during the trial, and again in the court's final instructions before the jury retired for its deliberation.

The admissibility of a recorded conversation is addressed to the sound discretion of the trial judge. Monroe v. United States, 1956, 98 U.S.App.D.C. 228, 234 F.2d 49. The appellant does not complain of the manner in which the recording was prepared and we find no error in respect to its authenticity or the foundation laid before it was presented to the jury. See, Brandow v. United States, 9 Cir., 1959, 268 F.2d 559. Appellant's chief objection is that the recording is inaudible and therefore inadmissible, but this has been succinctly rebutted in Monroe v. United States, supra, 234 F.2d at pages 54, 55:

"No all embracing rule on admissibility should flow from partial inaudibility or incompleteness. The Court of Appeals for the Third Circuit, in United States v. Schanerman, 150 F.2d 941, 944, has said that partial inaudibility is no more valid reason for excluding recorded conversations than the failure of a personal witness to overhear all of a conversation should exclude his testimony as to those parts he did hear. Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible * *."

See also, State v. Slater, 1950, 36 Wash. 2d 357, 218 P.2d 329; Annotation, 58 A.L.R.2d 1024, 1037.

We have listened to the recording carefully; although some portions are unintelligible, many significant parts are not. The thread, though thin in places, is never completely broken. We cannot unhesitatingly say that the inaudible segments are "so substantial" as to render the whole "untrustworthy" or that the lower court abused its discretion in admitting it in evidence.

The appellant relies on United States v. Schanerman, 3 Cir., 1945, 150 F.2d 941, where the appellate court affirmed the exclusion of transcribed notes which were prepared only after repeated playings of the record; he stresses the fact that the court reporter in this case was required to play the tape twelve times before an intelligible transcription could be effected and still he made eighteen entries of "inaudible". Schanerman is distinguishable, however, because there the attempt was made to offer the transcribed notes in evidence, while here only the recording itself was offered. Moreover, the court in that case affirmed the admission of the recordings from which the notes were transcribed, stating, " * * * the mere fact that certain portions of the mechanically recorded conversations were less audible than others did not call for exclusion of what the jurors personally heard from the 'playing' of the records." 150 F.2d at page 944.

It is also urged that the recording here was admitted as "independent testimony" of what had occurred in Curtis' apartment, and therefore the unintelligible portions require closer scrutiny than if the recording were admitted only for corroborative purposes, citing People v. Stephens, 1953, 117 Cal.App.2d 653, 256 P.2d 1033, where the court reversed a judgment of conviction because the *only* independent evidence of the purported conversation was the recording, and it was so defective that the portions which could be heard by the jurors were subject to different versions and varying interpretations.

This is not the situation presented here. It appears clear from the statements of the trial court to both counsel and jury that the recording was admitted for purposes of corroborating the testimony of Curtis and Bradford, who had previously testified from their own recollection regarding the conversation; appellant does not attack the validity of this purpose. See State v. Slater, 1950, 36 Wash.2d 357, 218 P.2d 329; Annotation 58 A.L.R.2d 1024, 1045. But whether the recording is treated as independent or merely corroborative evidence, the test of admissibility is basically the same, and where, as here, it is clear that the

inaudible portions are not substantial and do not render the audible parts unintelligible, the recording is admissible for either purpose. Monroe v. United States, 1956, 98 U.S.App.D.C. 228, 234 F.2d 49; see also, People v. Jackson, 1954, 125 Cal. App.2d 776, 271 P.2d 196.

Finally, appellant urges that the jury verdict is inconsistent because he was acquitted of Count II involving the same basic acts alleged to constitute extortion in respect to the automobile as the acts in respect to the extortion of $1,000 in Count I, of which he was found guilty. We see no such inconsistency: the jury could have believed that appellant's basic demand for an automobile was converted into a demand for "the money or the car," and thus the final, and only, extortion or attempted extortion was with respect to the $1,000. Also, it is clear that any inconsistency would not be fatally defective because "[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. * * *" Dunn v. United States, 1932, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356; Bryson v. United States, 9 Cir., 1956, 238 F.2d 657.

Affirmed.