**UNITED STATES of America, Appellee,**

v.

**Duane Ivan CARLSON; Jerome Nicholas Diemert; Mervyn Edward Henderson; Ervin John White and Milton James Dix, Appellants.**

**Nos. 23337–23341.**

United States Court of Appeals, Ninth Circuit.

Feb. 2, 1970.

Rehearing Denied April 27, 1970.

Curtis L. Shoemaker, Spokane, Wash. (argued) (in 23337); D. Gerald Brown, Joseph W. Cotchett, San Mateo, Cal. (in 23338); William F. Nielsen, Spokane, Wash. (argued), of Hamblen, Gilbert & Brooke, Spokane, Wash. (in 23339); Ronald G. Neubauer, Seattle, Wash. (argued) (in 23340); James S. Munn, Seattle, Wash. (argued) (in 23341).

Smithmoore P. Myers (argued), Asst. U. S. Atty., John M. Darrah, Asst. U. S. Atty., Dean C. Smith, U. S. Atty., Spokane, Wash., for appellee.

Before HAMLEY, DUNIWAY and CARTER, Circuit Judges.

HAMLEY, Circuit Judge:

Duane Ivan Carlson, Jerome Nicholas Diemert, Mervyn Edward Henderson, Ervin John White and Milton James Dix were convicted of conspiring to rob banks in a Seattle, Washington suburb in violation of 18 U.S.C. §§ 371 and 2113(a) and (d). Each has appealed,

and the appeals were argued together in this court. All the appeals are disposed of in this opinion.

According to the indictment, these five defendants and four others engaged in an alleged conspiracy between August 20, 1967, and January 26, 1968. As part of the conspiracy, the indictment alleges, defendants agreed to rob by force, violence, and intimidation three banks located at Redmond, Washington, and one bank located at Des Moines, Washington.

According to the Government's evidence, the defendants carried on most of their conspiratorial activity as members or associates of an organization known as the "Minutemen." [1] The Government's principal witness, Henry Edward Warren, became associated with that organization in about June, 1965, although he apparently did not become a full member until November, 1966. In about February, 1966, the activities of the Minutemen in the Seattle area began to trouble him, and he wrote to the Federal Bureau of Investigation (FBI). The FBI contacted Warren and asked him to report to it on the activities of the Minutemen unit with which he was associated. He did so, and this led to surveillance of defendants by the FBI and to defendants' ultimate arrest and prosecution.

Warren's testimony for the Government was corroborated to a considerable extent by the testimony of FBI agents and other witnesses. It was also corroborated by various exhibits consisting of ropes, stocking masks, firearms, incendiary devices and a tape recording surreptitiously obtained by Warren.

According to Warren, the conspiracy contemplated that on January 26, 1968, two teams of Minutemen, including all of the defendants, would simultaneously rob two banks in Redmond, Washington. The first team to complete its assigned robbery would then rob a third Redmond bank. The defendants planned to use stolen cars, which they termed "hot cars." As a diversionary tactic, they planned to set fire to two barns on the outskirts of Redmond. In addition, to assist in the robbery, a "blackout" was to be accomplished by blowing up a main power line leading into Redmond. Warren also testified that, in pursuance of the conspiracy, defendants attended various meetings and employed code names and numbers. Robbery paraphernalia was gathered, emergency patrol operations were planned, and get-away routes were laid out.

Only two of the defendants, White and Dix, produced testimony in their own behalf. However, by means of their opening statements, cross examination of Government witnesses, colloquy out of the presence of the jury, and arguments to the jury, all defendants made it clear that their principal defense was that all of their seemingly conspiratorial activity was only intended as a realistic training exercise. According to defendants, the activities in question were designed to train them, as Minutement, to carry on "resistance warfare" after the "communists" take over the country. They contended that there was no actual intent to rob banks or to commit other criminal offenses.

Appellants do not challenge the sufficiency of the evidence to support the jury verdicts finding them all guilty. All of their grounds for reversal relate to the conduct of the trial or to pretrial activities by members of the United States Attorney's office. We will first take up questions presented by the efforts of Dix to interject an insanity defense during the Government's case-in-chief and by the district court's subsequent removal of that issue from the jury's consideration.

---

[1.] As indicated in a printed leaflet received in evidence, the Minutemen are "a national organization of patriotic Americans who are preparing themselves as a last line of defense against communism." The headquarters of the organization is apparently in Norborne, Missouri. That office processes applications for membership, and makes available a booklet entitled "Principles of Guerrilla Warfare."

During the course of the trial, counsel for Dix requested leave to interrupt the Government's case to have a psychiatrist, Dr. William Albert Ogle, testify as to whether, at the time of the conspiracy, Dix lacked the mental capacity necessary to charge him with criminal responsibility. Counsel for Dix proposed this as an alternative defense, without abandoning his defense that Dix did not do anything wrong. Counsel in fact represented that Dr. Ogle's testimony would be relevant to both defenses, since it would also bear on the issue of specific intent.

The Government immediately suggested that the trial be bifurcated, so that the issue of Dix's sanity at the time of the crime could be dealt with following disposition of the cases involving the other defendants. Counsel for Dix objected to this proposal. Counsel for the other four defendants, Carlson, Diemert, Henderson and White (referred to herein as the four defendants) then joined in a motion to bifurcate the trial. They expressed concern that the hypothetical question which Dix's counsel intended to ask Dr. Ogle would in all probability implicate them in the alleged illegal conspiracy.

The trial court denied the motion to bifurcate the trial and allowed Dix's counsel to proceed with Dr. Ogle. However, the court cautioned counsel for Dix that any question involving any other defendant would be objectionable.[2] In addition, the court told the jury that Dr. Ogle was being called out of order and not as a part of the Government's case.

At the end of the hypothetical question and before Dr. Ogle gave his answer, the four defendants moved to strike the question, and moved for a mistrial on the ground that the propounding of the question prejudiced them. Dix and the Government opposed the motion. The motions were denied.

Dr. Ogle then expressed the opinion that, due to mental illness, Dix did not have the mental capacity to differentiate between right and wrong with reference to the charged conspiracy. Dr. Ogle also expressed the view that Dix's mental illness deprived him of the "psychological" capacity necessary to form an intent to be involved in a conspiracy at the time in question. Dr. Ogle was cross-examined by the Government but by none of the other defendants.

When counsel for Dix first began to propound the hypothetical question to Dr. Ogle, the Government objected that many of the assumed facts were not in evidence at that time. Counsel for Dix then assured the court that every fact assumed in the hypothetical question up to that time "will be in evidence, I will put it in evidence." He added: "I will attempt to put it in evidence through my client, if he takes the stand, and if not it may be disregarded." However, when it came time for Dix's defense, Dix, contrary to the advice of his attorney, refused to take the witness stand.

After all of the defendants had rested, counsel for the four defendants moved to strike the testimony of Dr. Ogle in its entirety on the ground that the facts assumed in the hypothetical question were not established by evidence. The Government did not join in this motion, and counsel for Dix resisted it. The court granted the motion and, in its instructions at the close of the case, advised the jury that the testimony of Dr. Ogle and the defense of mental incompetency introduced by Dix had been withdrawn from their consideration. This occurred three days after Dr. Ogle had given his testimony.

### Refusal to Bifurcate Dix's Insanity Defense

The four defendants urge that where several defendants are being tried to-

2. The court also stated that it proposed to caution Dr. Ogle, when he took the witness stand, that he was not to mention any situation or names involving the other defendants. The court did not so caution Dr. Ogle, but perhaps this was because Dix's counsel assured the court that he had already given Dr. Ogle such a warning.

gether before a jury on a conspiracy charge and all are relying on a general defense of "not guilty," it is error not to bifurcate an insanity defense presented by any one of defendants. Their claim is that the presentation of the insanity defense will prejudice all the other defendants, since that defense assumes commission of the acts charged, although denying mental responsibility.

The trial court undoubtedly had authority to bifurcate the trial if it had wished to do so. See Rules 14 and 57(b), Federal Rules of Criminal Procedure. However, analogous cases involving asserted prejudicial misjoinder indicate that the court erred in failing to bifurcate the insanity defense only if, under the circumstances, the refusal to do so constituted an abuse of discretion.[3]

Depending upon the circumstances of a case, it is entirely possible that evidence submitted before a jury with reference to an insanity defense may prejudice an alternative general defense of not guilty. As the District of Columbia Circuit said in Holmes v. United States, 124 U.S.App.D.C. 152, 363 F.2d 281, 282 (1966):

"This court has recognized that substantial prejudice may result from the simultaneous trial on [sic] the pleas of insanity and 'not guilty.' The former requires testimony that the crime charged was the product of the accused's mental illness. Ordinarily, this testimony will tend to make the jury believe that he did the act. Also, evidence of past anti-social behavior and present anti-social propensities, which tend to support a defense of insanity, is highly prejudicial with respect to other defenses. Moreover, evidence that the defendant has a dangerous mental illness invites the jury to resolve doubts concerning commission of the act by finding him not guilty by reason of insanity, instead of acquitting him, so as to assure his confinement in a mental hospital." (Footnotes omitted.)[4]

It should be noted that *Holmes* and the other cases cited in note 4 involved single-defendant trials, rather than a joint trial as we have here. Furthermore, Dix, who advanced the insanity defense, did not contend in the trial court (nor does he here) that evidence pertaining to that defense would prejudice him with respect to his "not guilty" defense. On the contrary, he asserted that such evidence would bear upon both defenses, because it would show that he lacked capacity to form the criminal intent necessary to engage in an unlawful conspiracy. Accordingly, Dix resisted the motion of the other defendants to bifurcate the trial.

But this distinction does not destroy the standing of the other four defendants to attack the district court's refusal to bifurcate. The pertinent question remains whether, in a jury trial, evidence submitted in support of the insanity defense advanced by one alleged conspirator is so likely to prejudice his codefendants that a sound exercise of discretion requires bifurcation.

While under the facts of a particular case one defendant may be prejudiced by the un-bifurcated insanity defense of a codefendant,[5] we think this question cannot be answered in the abstract and as a general proposition. Whether there is a likelihood that codefendants will be prejudiced depends upon the part which, under the evidence, each defendant played in the alleged con-

3. See United States v. Davis, 418 F.2d 59 (9th Cir. 1969); Daut v. United States, 405 F.2d 312, 314 (9th Cir. 1968); Morgan v. United States, 380 F.2d 686, 695 (9th Cir. 1967); Mendez v. United States, 349 F.2d 650, 652 (9th Cir. 1965).

4. *See also*, Contee v. United States, 133 U.S.App.D.C. 261, 410 F.2d 249, 250 (1969). *But see* United States v. Huff, 409 F.2d 1225, 1228 (5th Cir. 1969); Bell v. Patterson, 402 F.2d 394, 399 (10th Cir. 1968).

5. *See* United States v. Reed, 376 F.2d 226, 229 (7th Cir. 1967) (principal's retrial ordered to be separate due to possible prejudicial impact of accomplice's insanity defense).

spiracy, the nature of the evidence as to insanity, the particular basis for the general defense of not guilty relied upon by the other defendants, and other factors which may vary from case to case.

Moreover, where the trial court denies bifurcation, the measures taken to minimize or eliminate prejudice must also be considered. In addition, where an appellate court faces the claim that the trial court abused its discretion in denying a motion by codefendants to bifurcate, account must be taken of the posture of the case when the question arose, the information the trial court then had as to the nature of the evidence to be offered in support of the insanity defense, and the problems which would be created by bifurcating the trial.

As shown above, the bifurcation problem in this case arose in the middle of the trial when Dix asked permission to interrupt the Government's case to put Dr. Ogle on the witness stand. Counsel for Dix assured the court that he would present evidence of all of the assumed facts upon which the hypothetical question to be asked of Dr. Ogle would be based.

The court was led to believe that Dix would himself take the witness stand, thus subjecting himself to cross examination by the other defendants. Counsel for Dix also assured the court that no other defendant would be named in the hypothetical. He told the court that his client would be prejudiced if Dr. Ogle could not testify because the psychiatrist would not be available later and because his testimony would also be relevant to Dix's general defense of not guilty.

The court was then aware of the limited scope of the principal defense of all the defendants, namely, that they participated in the activities testified to by the Government witnesses, but that in doing so they were engaged only in a realistic training exercise with no real intent to rob the banks. The court also noted that because of publicity prospects, bifurcation of Dix's insanity defense would probably make it necessary to sequester the jury for several days after return of the verdicts as to the other defendants, while Dix's insanity defense was being presented.

In view of all of the circumstances referred to above, we are unable to say that in denying bifurcation of Dix's insanity defense, when the question arose in the middle of the trial, the district court abused its discretion.

*The Hypothetical Question*

The question remains whether what actually happened after the district court denied the motion for bifurcation deprived the four defendants of a fair trial or of their right to confront the witnesses against them. The defendants first raised these questions in the trial court when they moved for a mistrial as soon as counsel for Dix had completed his hypothetical question. That motion was denied.

The assumed facts given Dr. Ogle in the course of the hypothetical question related primarily to Dix's activities before and during the operation of the alleged conspiracy. No other defendant was mentioned by name. It is fair to say, however, that the content of the hypothetical was such that the jury would naturally conclude that the unnamed individuals with whom Dix dealt under the assumed facts were the other four defendants. Dix's activities and contacts, as assumed in the hypothetical, closely paralleled the testimony given by the Government witnesses pertaining to plans to rob the banks. Some references in the hypothetical to unnamed individuals, such as the references to a "courier" and to persons who were at certain assumed meetings or in automobiles on assumed occasions, were especially likely to draw attention to the other defendants.

But when the hypothetical question is carefully analyzed, it will be seen that the assumed facts impliedly involving the other defendants painted the same picture concerning their activities as they were themselves to present. All of

them, through *arguments of their counsel*, made it clear to the jury that they participated in the Minutemen activities assumed in the hypothetical question. They contended only that this was a realistic training exercise, without intent actually to rob banks. The hypothetical question did not assume otherwise.

The only proposition in the hypothetical which might possibly be construed as an assumption that the four defendants actually intended to rob banks reads as follows:

> "Assume, Dr. Ogle, that Mr. Dix had been informed that the Minuteman organization or chapter in Seattle \* \* \* supposedly had received orders to rob banks in the Seattle area."

The "supposedly" in this assumed fact interjects an ambiguity which, however, is clarified if reference is made to the immediately preceding assumption, which reads:

> "[A]ssume further that Mr. Dix was told that there had been an order for a training exercise involving banks in the Seattle area, but that at that time Mr. Dix didn't know that it was a training exercise."

Reading the two sentences together, it appears that the hypothetical did not assume that the Seattle Minutemen had received orders to rob banks. Rather, they were to conduct a training exercise involving the robbing of banks, although when Dix participated, he was not aware that it was only a training exercise.

■ We conclude, looking at the trial and at the content of the hypothetical in retrospect, that the four defendants were not prejudiced in any substantial respect. Accordingly, the propounding of that question did not deprive them of a fair trial.

■ The four defendants further argue, however, that the rationale of Bruton v. United States, 391 U.S. 123,

88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), condemns the hypothetical question asked of Dr. Ogle and requires reversal. *Bruton* and subsequent cases relying upon it[6] hold that the Confrontation Clause of the Sixth Amendment is violated when the prosecution puts an admission, confession, or other out-of-court statement of an accomplice or a codefendant before the jury in a way which deprives the aggrieved defendant of any opportunity to cross examine the declarant. In making this argument the four defendants apparently ask us to assume that the hypothetical question propounded to Dr. Ogle by Dix's counsel must have been taken by the jury as the equivalent of testimony by Dix, who, as mentioned, refused to take the stand.

Even if we adopt this assumption, there are several reasons why, in our opinion, *Bruton* does not require us to overturn these convictions. First, *Bruton* focusses only on "powerfully incriminating extrajudicial statement[s]." *See* United States v. Davis, 418 F.2d 59 (9th Cir.1969); Cortez v. United States, 405 F.2d 875, 876 (9th Cir.1968). That characterization scarcely applies to the hypothetical posed to Dr. Ogle, where the references and the prejudice to the defendants were at most minimal.

Second, and in the same vein, the facts of this case bring it closer to those of Frazier v. Cupp, 394 U.S. 731, 89 S. Ct. 1420, 22 L.Ed.2d 684 (1969), than to *Bruton*. In *Frazier* the prosecutor in his opening statement to the jury summarized inculpating testimony he expected to elicit from defendant's accomplice. Then, in the prosecutor's case-in-chief, the accomplice refused to take the stand. Holding that the prosecutor's actions did not violate *Bruton*, the Court stressed that the prosecutor's statement was only a paraphrase of the accomplice's declaration, and, "unlike the situation in \* \* \* *Bruton*, [the] statement was not a vitally important part of the pros-

6. *See, e. g.*, Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Frazier v. Cupp, 394 U.S. 731 (1969); United States v. Davis, 418 F.

2d 59 (9th Cir. 1969). Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L. Ed.2d 1100 (1968), held that *Bruton* is to be applied retroactively.

,cution's case." 394 U.S. at 735, 89 S. Ct. at 1423. The same comments may be made of the hypothetical at issue in the present case, especially since it was not a part of the prosecution's case at all.

Finally, the largely innocuous nature of the hypothetical compels us to hold that even if there was a *Bruton* violation in this case, it constituted harmless error within the meaning of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

### Withdrawal of Dix's Insanity Defense

Dix argues that the trial court erred in striking the testimony of Dr. Ogle and in withdrawing from the jury the issue of Dix's sanity at the time of the crime. The trial court struck Dr. Ogle's testimony on the motion of the four defendants and not upon the motion of the Government. It did so on the ground that some of the facts assumed in the hypothetical question were not established in the evidence.

■ Dix asserts that there was nothing in the hypothetical question which was not in evidence or which could not have been reasonably inferred from other evidence in the case. But Dix does not supply us with references to the record wherein such evidence is to be found. In the absence of such a showing we are entitled to assume that the

trial court correctly determined that the evidence was deficient. We have nevertheless attempted to ascertain what assumed facts, if any, were not supported by evidence or reasonable inferences therefrom. Insofar as we have been able to determine, without the assistance of counsel for Dix, there was no supporting evidence for at least the eight items listed in the margin.[7] Therefore it was not an abuse of discretion for the district court to withdraw the hypothetical. *See, e. g.,* Grand Island Grain Co. v. Roush Mobile Home Sales, Inc., 391 F.2d 35, 40 (8th Cir.1968).

■ Dix also argues that Dr. Ogle did not base his opinion as to Dix's mental capacity exclusively upon the facts assumed in the hypothetical, and therefore, the insanity defense should not have been stricken even if the hypothetical was properly withdrawn by the court.

It is true that Dr. Ogle founded his opinion to a considerable extent upon his three clinical observations of Dix and upon the assumed facts testified to by the Government's principal witness, Warren. However, had the insanity defense remained before the jury, there would have been no way the jury could have determined the extent to which Dr. Ogle had improperly relied upon the withdrawn hypothetical in arriving at his opinion. And, when the court announced that Dr. Ogle's testimony would be stricken because of the unsupported

---

7. (1) Dix was somewhat indifferent to the performance of his assigned "training" duties, and did not meet the training schedule assigned to him; (2) Dix was from time to time criticized for his failure to perform the training exercises assigned to him, such as infiltrating Communist organizations; (3) Dix did not know that the plan involving the robbery of banks was only a "training" exercise; (4) Dix assumed that orders as to his specific part in the "training" plan came from Robert DePugh, national head of the Minutemen organization; (5) on January 25, 1968, Dix drank about half of a fifth of Old Boston one hundred proof liquor, and on his way to a meeting at Ranier Lanes that day he drank some

beer; (6) on the day the "training" exercise was to take place, Dix mistakenly went to the Public Library in the Seattle University District, rather than to his assigned station at the University of Washington library; (7) Dix became lost while trying to find the Valu-Mart store in the Bellevue-Redmond area and inquired directions at several gasoline stations; (8) at 12:30 a. m., January 26, 1968, Dix made a telephone call with the express purpose of stating that he had no intention of showing up the next morning or going through with the plan, but the person who answered the telephone cut him off, saying he could not talk to him at that time.

hypothetical, Dix did not ask that Dr. Ogle be recalled to testify independently of the hypothetical.

### Jury's View of Prejudicial Articles

All defendants contend that the trial court erred in failing to grant their motions for a mistrial made after the bailiff and a clerk of the court brought certain allegedly prejudicial articles into the courtroom in the jury's presence. The entry of the articles occurred before their admissibility had been determined.

The items were brought in just as the district court had asked the jury to retire for a recess, but before they had left the courtroom. At that point the bailiff entered the courtroom from the spectator's entrance, carrying two boxes the contents of which were not visible. A deputy clerk followed, bearing some plastic envelopes, an M–1 carbine, a telescopic sight, and possibly a silencer.

Counsel for defendants immediately objected to the bringing of the articles into the courtroom at that time and asked that they be removed on the ground that the Government had not yet connected them with the defendants. The court once more instructed the jury to retire, and the articles were removed from the courtroom. After the jury had left, defendants moved for a mistrial, contending that they were prejudiced beyond cure. Government counsel explained that they had not requested that the articles be brought into the courtroom at that time.[8] The Government also argued that there was not such prejudice as to require a mistrial, pointing out that the jury had seen other weapons in the case.

The district court denied the motion for a mistrial, and, after a recess, the trial resumed. Shortly thereafter defendants moved successfully to suppress the items prematurely brought into the courtroom, since the Government failed in its efforts to connect the items up to the defendants. Defendants then renewed their motion for a mistrial, but the court apparently denied the motion since it allowed the trial to continue.

■■ The denial of a motion for a mistrial rests within the sound discretion of the trial court and can be held to be error only if it amounts to a clear abuse of that discretion. Since the jury had only a fleeting view of the articles, since there was much other testimony and some exhibits pertaining to other weapons, and since no misconduct is chargeable to Government counsel, we hold that the trial court did not abuse its discretion.

While a cautionary instruction on these items might have been appropriate, defendants did not request one, and the court was not obliged to give such an instruction on its own motion. In dealing with incidents such as this counsel for defendants often prefer not to have the matter further emphasized by the giving of a cautionary instruction. Absent such a request, the trial court was entitled to assume that this was defense counsel's preference.

### Curtailment of Cross-Examination of Government's Chief Witness

Defendant Henderson argues that the trial court erred in curtailing cross-examination of the Government's principal witness, Warren, concerning the latter's knowledge of the principles, objectives and methods of operation of the Minutemen organization.

The court sustained the Government's objection to this cross-examination on the ground that it went beyond the scope

---

8. On this appeal defendants disclaim any suggestion that Government counsel were responsible for displaying the items before the jury. In their reply brief, however, they note that when counsel for Dix moved, early in the trial, for suppression of this evidence, Government counsel assured the court that the Government would not "parade" the guns into the courtroom until the motion had been ruled upon. As indicated above, the individuals who brought the articles into the courtroom were not connected with the United States Attorney's office, but with the federal court system.

of the Government's direct examination of Warren. Thereafter counsel for Henderson did not call Warren as his own witness for the purpose of eliciting this information. Warren was recalled by counsel for White, but neither he nor counsel for any other defendant asked Warren any questions of the kind the court would not permit on cross-examination.

■ The scope of cross-examination lies within the sound discretion of the trial court. No abuse of this discretion is shown in connection with the curtailment of Warren's cross-examination.

### Introduction of Government's Tape Recording

Defendants Diemert and White argue that the trial court erred in overruling their objection to the introduction in evidence of a tape recording of a conversation at a meeting of defendant attended by Warren. Warren concealed a tape recorder on his person at the meeting in question.

At trial several of the defendants moved to suppress the tape on numerous grounds. After listening to the tape, the trial court overruled these objections and permitted the tape to be played once to the jury in the courtroom. Neither the tape nor a transcript of it was permitted in the jury room. The only one of these initial objections to the tape renewed on this appeal (by Diemert and White) is that the tape was inaudible and could not be regarded as a substantially correct reproduction of what took place.

The Government concedes that the tape was only partially audible. The court reporter, however, was able to understand and transcribe for the record (but not for the jury) a substantial part of it. The transcript of the tape corroborates Warren's testimony that the defendants discussed such matters as code names and numbers, the use of pistols and rifles, the preparation and use of tie ropes, and directions for the use of "Molotov cocktails."

■ In our view, the trial court proceeded with abundant caution with respect to this particular objection to the tape, and his action in overruling this ground of the objection was not an abuse of discretion. See Todisco v. United States, 298 F.2d 208, 211 (9th Cir.1961); Cape v. United States, 283 F.2d 430, 434–435 (9th Cir.1960).

Diemert and White also argue, for the first time on this appeal, that the introduction of the tape violated their Fourth Amendment rights because the Government agents failed to obtain prior authorization from a magistrate for this electronic surveillance. In this connection, Diemert and White call attention to the recent Supreme Court decisions cited in the margin.[9]

Assuming that, under the plain error rule (Rule 52[b], F.R.Crim.Proc.), Diemert and White may raise this constitutional question for the first time on appeal, the argument is without merit because it is based upon a faulty factual premise. A search warrant had been issued by a magistrate authorizing Warren to conduct this electronic surveillance. Defendants do not object to the validity of that warrant.

### Denial of Effective Representation by Counsel

Dix contends that he was denied effective representation by counsel in violation of the Fifth and Sixth Amendments because Government prosecuting and enforcement personnel met with him, without the knowledge of his counsel, after the indictment had been returned. Dix also argues that this activity violated Canon 9 of the Canons of Professional Ethics.

On the morning of May 8, 1968, slightly more than a month prior to the trial, Dix telephoned Assistant United

---

9. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966).

States Attorney John M. Darrah. Dix requested a meeting with Darrah away from the United States Court House which would be kept confidential from his then retained counsel, James J. Caplinger. Darrah agreed because he hoped to learn more of certain threats which he understood had been made against a member of Dix's family. Also, he hoped to learn something of the whereabouts of Robert B. DePugh, a co-defendant who had not been apprehended.

The meeting, which lasted about twenty minutes, took place that afternoon at the Seattle Public Library, with an FBI agent, V. P. Coyne, also in attendance. The United States Attorney, Eugene G. Cushing, had also planned to attend this meeting but was prevented by illness from doing so. According to Darrah, he told Dix at the outset of this meeting of Dix's right to have his attorney present at that meeting or at any meeting. Dix stated that he was thinking of pleading guilty to avoid publicity and humiliation detrimental to his mother's health. Dix then inquired of Darrah if it was possible to change his plea to guilty.

There was discussion as to whether the district court would accept such a plea. Darrah told Dix that his attorneys would be the best judges of this. Dix stated that he had fully discussed the matter with his attorneys and that he wanted to ignore their advice if a trial could be avoided. Darrah urged Dix to meet again with his attorneys in an attempt to arrive at a proper decision.

It is Dix's recollection that Darrah and Coyne said they wondered if Dix would receive competent representation if Caplinger and Caplinger's law partner also represented Robert DePugh, who was under indictment on the same conspiracy charge. Darrah and Coyne deny making such an observation, but Darrah recalls that he asked Dix whether his attorneys would also represent DePugh and Dix replied in the negative.

At the request of the United States Attorney, Darrah telephoned Dix on the morning of May 9, 1968. Darrah advised Dix that if he still desired help in making up his mind about pleading guilty, the United States Attorney would be willing to talk to him. Dix went to the office of the United States Attorney later that morning and conferred with him and Darrah for twenty minutes. No one else was present, and Dix's counsel had not been advised of the meeting.

At this second meeting the United States Attorney agreed with Dix that it would be easier on Dix's family if he pleaded guilty. According to Dix, the two Government attorneys also told him that he would be a lot better off if he changed his plea, as he had only a minor role in the conspiracy. Dix says he was told that his chances for probation would be good if he led a clean life and paid his bills. The United States Attorney told Dix that it was his impression that Caplinger and his partner, James A. Munn, would be representing DePugh and that if this were the case it would be difficult for them to represent both Dix and DePugh fairly and effectively. Darrah denies that Dix was told he would receive any different treatment if he pleaded guilty.

The United States Attorney suggested that Dix telephone his attorney, Caplinger, right then and there to discuss the matter with him. As it was then the lunch hour, it was agreed that Dix would go to the office of his attorneys after lunch and that the United States Attorney would place a telephone call to them at 1:30 p. m. Dix went to his attorneys' office and discussed the matter with Caplinger and Munn. The United States Attorney then telephoned and discussed the matter briefly with Caplinger and at greater length with Munn. The Government attorneys assert, and Dix does not deny, that they did not, at either of the meetings, discuss with Dix the details of his defense or gain any information helpful to the prosecution.

Dix brought this matter to the attention of the district court prior to trial

on a motion to dismiss as to him. Upon the basis of counter affidavits which are, for the most part, not in conflict, the court held that the Government attorneys acted improperly. However, it also held that, as of then, there was no showing that Dix had been prejudiced. Accordingly, the court denied the motion to dismiss but enjoined Government attorneys and law enforcement officers from talking to any of the defendants concerning the case in the absence of their counsel or without the latter's consent.[10]

■■■ The district court correctly held that the contacts by the United States Attorney and his representatives with Dix without the knowledge and consent of Dix's counsel were improper. But, according to the prior case law of this circuit, this conduct does not necessarily amount to a constitutional law or Canon 9 violation requiring reversal of Dix's conviction.

This court held in Coughlan v. United States, 391 F.2d 371 (9th Cir.1968), Judge Hamley dissenting, and Reinke v. United States, 405 F.2d 228 (9th Cir. 1968), that post-indictment statements by defendants to FBI agents in the absence of defendants' counsel were admissible where full *Miranda* warnings (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 [1966]) had been given.[11] However, in the more recent case of Schantz v. Eyman, 418 F.2d 11 (9th Cir.1969), where, *on the county attorney's instructions*, a state psychiatrist attempted to conduct post-indictment questioning of a defendant in the absence of his attorney, we held it reversible error to permit the psychiatrist to testify that defendant refused to submit to his questioning.[12]

With respect to the propriety of such post-indictment contacts, our case resembles *Schantz* more than either *Coughlan* or *Reinke*. In *Schantz* and in this case, unlike *Coughlan* and *Reinke*, the legal arm of the government, as distinguished from the investigating arm, played a direct role in the post-indictment contact with the defendant. However, under the logic of *Schantz*, reversal is not required unless potentially substantial prejudice to Dix at trial inhered in the Government's post-indictment contacts, and unless counsel's presence would have helped avoid that prejudice.

Prejudice was shown in *Schantz* because the testimony of the Government's psychiatrist tended to undermine the defendant's insanity defense. In our case, on the other hand, prejudice to Dix's case was not shown. Dix requested the meetings in order to explore the possibility of pleading guilty so that his family could be saved further hardship. He did not ask for an opportunity to discuss the merits of his case, and no such discussion occurred other than the alleged remarks by the Government attorneys that he played only a minor role in the conspiracy. The Government attorneys did not agree to the confrontation in order to obtain information which would

10. At the close of the Government's evidence, Dix renewed the motion to dismiss as to him because of the post-indictment contacts between Government attorneys, an FBI agent, and himself in the absence of and without the knowledge of his counsel. The trial court held, in effect, that nothing had occurred during the presentation of the Government's case that indicated that Dix had been in any way prejudiced by these contacts. The court therefore adhered to the pretrial ruling denying Dix's motion to dismiss.

11. In *Coughlan*, however, the majority warned that it did not condone the practice of interviewing an accused person in jail in the absence of counsel. The court added "The better, fairer and safer practice is to afford the defendant's attorney reasonable opportunity to be present." 391 F.2d at 372.

12. The *Schantz* holding discusses two possible infringements of the defendant's rights: (1) the attempted post-indictment psychiatric interrogation of *Schantz* violated his right to the assistance of counsel at all critical stages; and (2) the prosecutor's activity constituted a gross violation of professional ethics. For documentation, *Schantz* refers to the dissenting opinion in Coughlan v. United States, 391 F.2d 371, 372 (9th Cir. 1968). 418 F.2d at 13, note 6.

help in the prosecution of Dix, and the trial court correctly found that no such information was supplied. At both conferences the Government counsel urged Dix to consult his attorney. No plea of guilty was entered, and nothing Dix said was brought to the attention of the jury.

Nevertheless, on this appeal Dix argues that the remarks of the Government attorneys that Caplinger could not effectively represent both DePugh and Dix so undermined Dix's confidence in Caplinger that he refused to follow the latter's advice to testify in his own behalf. As noted above, it was Dix's refusal to testify or to put on other testimony providing evidentiary support for all of the facts assumed in the hypothetical question that led the court to withdraw the hypothetical question and the insanity defense.

If such a contention had been made at the trial, and if there was factual support for it in the record, reversal might be necessary. But Dix does not provide a record reference showing that such a contention was advanced in the trial court, nor has our own examination of the record revealed one. Moreover, insofar as we have been able to determine without the assistance of Dix's counsel, the record contains no factual support for the assertion that Dix declined to testify because he had lost confidence in Caplinger as a result of Dix's meetings with Government attorneys or otherwise. Caplinger represented Dix throughout the trial. Moreover, at the point in the trial when Dix refused to testify, he was questioned by the court and gave no intimation that such refusal was based upon a loss of confidence in Caplinger. Finally, on this appeal Dix is represented by Caplinger's general partner, James S. Munn.

We conclude that the trial court did not err in refusing to dismiss the case as to Dix because of the incidents described above. We do, however, most vigorously renew the caution expressed in *Coughlan,* see note 12, *supra,* that prosecuting and law enforcement officials should not confer with defendants after return of an indictment in the absence of the defendant's attorney unless the attorney consents thereto.

The several other arguments advanced by one or more of the defendants on this appeal have been considered, but we find them so lacking in merit that discussion is not required.

Affirmed.