Stanley Chester BOLEN, Delores Bolen and Aqua Trailers, Inc., a Washington corporation, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17610.

United States Court of Appeals Ninth Circuit.

May 29, 1962.

Riner E. Deglow, Spokane, Wash., and Chauncey Tramutolo, San Francisco, Cal., for appellants.

Frank R. Freeman, U. S. Atty., and Patrick H. Shelledy, Asst. U. S. Atty., Spokane, Wash., for appellee.

Before CHAMBERS and DUNIWAY, Circuit Judges, and JAMESON, District Judge.

JAMESON, District Judge.

Appellants were convicted on three counts of an indictment charging the use of mails to defraud in violation of Title 18 U.S.C. § 1341,[1] and acquitted on a fourth count charging conspiracy in violation of Title 18 U.S.C. § 371.

In each of the first three counts it was charged in substance that prior to April 16, 1959, and continuing to the date of the indictment (June 23, 1960) the defendants devised a scheme and artifice to obtain money and property from purchasers of merchandise, including folding plastic boats, from Aqua Trailers, Inc., one of the appellants, by means of false and fraudulent pretenses, representations and promises, in that the defendants represented to purchasers that shipments of merchandise would be made upon the payment of a specified down payment and the balance be collected after shipment by sight drafts drawn upon a purchaser through banks designated by the purchasers; that defendants represented to employees of the Spokane and Eastern Branch of the Seattle-First National Bank that defendants were making shipments of merchandise and desired to collect therefor through banks designated by the purchasers by sight drafts drawn on the purchasers, with attached bills of lading, including invoices and shipping documents evidencing shipment; that the defendants caused sight drafts to be drawn and sent by said bank with spurious, false and fictitious bills of lading, invoices, and other documents purporting to evidence shipments of merchandise; that defendants received payment of said drafts, well knowing that they did not intend to, would not, and did not ship the

---

1. 18 U.S.C. § 1341 provides in pertinent part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department * * * or knowingly causes to be delivered by mail * * * such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

merchandise as evidenced by the spurious documents; that in order to lull purchasers into a false sense of security, upon inquiry regarding shipments of merchandise, defendants advised the purchasers that such shipments had been made and that the purchasers should allow for delays by the transfer company.

■ In furtherance of this scheme and artifice, it is charged in Count One that on or about June 11, 1959, defendants placed or caused to be placed in an authorized depository for mail an envelope containing a sight draft for $400.00 payable to Aqua Trailers, Inc. and drawn on Catron Motors, Inc. of Pomona, California, and a false and fictitious bill of lading for "one carton of merchandise", the envelope and contents to be sent by the post office establishment of the United States to the Pomona Branch of the Bank of America at Pomona, California. It is charged in Count Two that on August 21, 1959, the defendants placed or caused to be placed in an authorized depository for mail an envelope containing a sight draft for $5,-850.00 payable to Aqua Trailers, Inc., drawn on Dana Motors, Sacramento California, and an invoice purporting to evidence shipment of 15 Aqua Trailers, Serial No. 301 through 315, for a total amount of $5,850.00, said envelope and contents to be sent by the post office establishment of the United States to Crocker-Anglo Bank, Capitol Office, Sacramento, California. It is charged in Count Three that on or about June 11, 1959, the defendants placed or caused to be placed in an authorized depository for mail an envelope containing a sight draft for $379.50 payable to Aqua Trailers, Inc. and drawn on Rivers Boat Mart, Tempe, Arizona, and an invoice purporting to evidence shipment of one Aqua Trailer unit, Serial No. 210, the envelope and contents to be sent and delivered by the post office establishment of the United States to the First National Bank of Arizona at Tempe, Arizona.

. Motions for acquittal were made and denied at the close of plaintiff's case and again at the close of all the evidence. The sole question presented on appeal is the sufficiency of the evidence to sustain the conviction, appellants contending (1) that the Government failed to sustain its burden of proving a scheme to defraud; (2) that the circumstantial evidence did not exclude every reasonable hypothesis of innocence; (3) that the Government failed to prove that the mails were used; and (4) that the Government failed to prove criminal intent.

In 1957 appellant Stanley Chester Bolen was operating an appliance repair and sand blasting company. He invented a folding "boat trailer", to be made of fiberglass. In 1958 a corporation, the appellant Aqua Trailers, Inc., was organized to manufacture and sell the boats. Bolen and his wife, Delores Bolen, the third appellant, conveyed to the corporation their assets, including the manufacturing rights for the boat trailer and certain equipment and supplies. Each received in exchange 5,000 shares of the capital stock of the corporation,[2] and in addition the corporation recognized an indebtedness to the Bolens of $14,786.87. An additional $7,000.00 or $8,000.00 was realized from the sale of stock to friends and acquaintances. Bolens at all times owned over 50% of the stock and were in control of the corporation. Mr. Bolen was president and Mrs. Bolen secretary.

Early in 1959 appellants applied to the Spokane and Eastern Branch of Seattle-First National Bank for a loan to obtain funds for financing production of the boats. This application was rejected by the bank. Around May 1, 1959, appellants and the bank agreed upon a method of "accounts receivable financing", whereby Aqua Trailers, Inc. would assign accounts as collateral for loans made by the bank. The Bolens individually executed a written guarantee of all loans. This method of financing was new to the Bolens, but was explained to them by

2. The authorized capitalization was $50,000.00, consisting of 50,000 shares of the par value of $1.00 per share.

Thomas Claire Kearns, assistant vice president of the bank.[3] Mr. Kearns testified that he told the Bolens that it was necessary for them to get the boat into the hands of the carrier and to bring a bill of lading to be enclosed with the draft which the bank would draw on the customer's account.[4]

The first loan of $1,500.00 was made on May 8, 1959. Mr. and Mrs. Bolen brought four bills of lading and four invoices to the bank. Kearns inspected all of these instruments. Later he "spot checked." He did not at any time find an instrument where there was no bill of lading, except on the Dana transaction (Count Two), which did not involve a loan by the bank.

With respect to Count One, it appears from the evidence that on April 16, 1959, John H. Catron, proprietor of Catron Motors, Inc. of Pomona, California, ordered two boat trailers making a down payment of $110.00, the balance to be collected on delivery. On June 11, 1959, Mr. and Mrs. Bolen took to the Spokane and Eastern Branch of Seattle-First National Bank bills of lading and invoices for the Catron and other accounts. A sight draft for $400.00 was drawn on Catron Motors and mailed with the collection notice to Catron's bank. Catron paid the draft and picked up the bill of lading form and invoice. A few days later he called the carrier shown on the bill of lading and thereafter called Aqua Trailers, Inc. in Spokane. He talked with Mrs. Bolen and told her that the carrier had not received the boat for shipment. She informed Catron that the boat had been picked up by the wrong

carrier and sent to the wrong place, and that another boat would be shipped the following day. Neither carrier had any record of a shipment to Catron Motors, Inc. from April 1, 1959, through September 30, 1959. In a conversation with Art Hanson, deputy prosecuting attorney for Spokane County, around September 1, 1959, Bolen blamed the carriers for the failure of delivery. Shortly thereafter Catron's money was refunded.

With respect to Count Two, in late July, 1959, Bolen went to Sacramento and discussed possible distributorship and franchise with Robert J. Dana. Dana testified that following further telephone conversations with both Mr. and Mrs. Bolen, Dana told the Bolens in late August that he was not interested in putting out money for the franchise, but would "order 15 boats and * * * pay for them by the bill of lading draft method"; and that it was agreed that the "method of payment was to be by bill of lading sight draft". Mrs. Bolen testified that Dana told "us to send an invoice to Mr. Al Lord, of the Crocker-Anglo Bank in Sacramento, and that is exactly what we did". Dana, in anticipation of the draft, left a signed check for $5,850.00 with his office manager when he left on a trip.

On August 21, 1959, Bolens went to the Spokane bank with Invoice No. 1136 for the 15 boats and drafted Dana Motors for $5,850.00. Dana's office manager paid the draft on August 27, 1959. Upon his return to Sacramento a few days later, Dana found no bill of lading and tried to stop payment on the draft. He was too late and telephoned appellants,

3. Kearns testified in part: "Well, we discussed the procedure that we are going to go through in handling these accounts because it was new to them, and I advised them that we would ask them to bring in a schedule of accounts, X, Y, Z Company and John Doe Company, and we would take those accounts and they would assign them individually, the accounts receivable, and we would take those as collateral for a loan, and in addition to that we required that they bring in bills of lading which in order to maintain control we sent them out by our collection department."

4. Kearns testified on cross examination: "Well, I told them (the Bolens) that it was necessary for them to get the boat in the hands of the carrier, whether it be the railroad or whether it be a motor freight, and to bring a bill of lading and enclose it in their particular draft which we draw on the customer's account and in the meantime we would check the credit worthiness of these particular accounts which they were drawing drafts on."

874

talking with Mrs. Bolen. Dana testified that he told Mrs. Bolen he did not find a bill of lading and she replied that there must have been an oversight, that the boats would be shipped immediately. Later Dana received four of the 15 boats. In September he met with the Bolens in Spokane, but at that time the factory was locked and there was no activity. Dana sustained a loss of $4,775.88.

The evidence on Count Three discloses that on April 12, 1959, Kenneth R. Rivers, proprietor of Rivers Boat Mart, Tempe, Arizona, sent a letter to Aqua Trailers, Inc. with a check for $150.00 as a down payment on five boats, to be shipped C.O.D. On June 11 Bolens presented the invoice and bill of lading for one of the boats to the Spokane bank. A few days later the First National Bank of Tempe, Arizona, notified Rivers that it had a sight draft and bill of lading for him. Rivers did not pay the draft immediately but waited a few days, hoping for delivery. On July 2, however, he paid the draft, without delivery, and received the bill of lading and invoice. Near the end of July Bolen called Rivers and asked Rivers how he liked the boat, and expressed surprise that the boat had not arrived. A boat was delivered to Consolidated Freightways for Rivers on July 20, 1959, and delivered to Rivers on July 30, 1959, shortly after the telephone conversation between Bolen and Rivers.

On July 31, 1959, appellants drew another sight draft on Rivers for $1,518.00, and the bank made a loan thereon. In the early part of August the First National Bank of Tempe called Rivers on this draft. Rivers told the bank he would not pay the draft until he had delivery of the four remaining boats. Rivers heard nothing further from any carrier or the bank. Kearns testified that when he questioned Mrs. Bolen regarding this transaction she told him that the boats got misplaced at some terminal and assured him that the "merchandise would get there".

It was incumbent upon the Government to prove to the satisfaction of the jury beyond a reasonable doubt a scheme to defraud and the use of the United States mails in furtherance of the scheme.[5] The evidence is both direct and circumstantial. While there is some conflict in the testimony, we must view the evidence in the light most favorable to the Government, including the reasonable inferences to be drawn therefrom.[6] If, viewed in this light, there is substantial evidence to support the jury's verdict, it must be sustained.[7]

The rule for determining the sufficiency of circumstantial evidence on motions for acquittal was stated by this court in Remmer v. United States, 1953, 9 Cir., 205 F.2d 277, 287, as follows:

"The test to be applied on motion for judgment of acquittal * * * is not whether in the trial court's opinion the evidence fails to exclude every hypothesis but that of guilt, but rather whether *as a matter of law* reasonable minds, as triers of the fact, *must* be in agreement that reasonable hypothesis other than guilt could be drawn from the evidence. * * * If reasonable minds *could* find that the evidence excludes every reasonable hypothesis but that of guilt, the question is one of fact and must be submitted to the jury."[8]

It is our conclusion from a careful examination of all the evidence that reasonable minds could find that the evidence excludes every reasonable hypothesis but that of guilt. Accordingly the motions for acquittal were properly denied and the verdict of the jury must be sustained.

5. See Northcraft v. United States, 8 Cir. 1959, 271 F.2d 184.

6. Cape v. United States, 9 Cir. 1960, 283 F.2d 430, 433; Schino v. United States, 9 Cir. 1953, 209 F.2d 67, 72, rehearing denied 1954, cert. denied 1954, 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087.

7. Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

8. This rule was quoted with approval in Cape v. United States, supra, where, as here, the evidence was both direct and circumstantial.

Appellants needed money for production. They could obtain money from their bank and customers by issuing sight drafts, drawn on the customers, accompanied by bills of lading. The jury could reasonably find from the evidence that the appellants knew that the merchandise should be in the hands of the carrier before they were entitled to issue the drafts and bills of lading. They were so advised by Kearns; but even more persuasive in showing such knowledge is the clear evidence of their stalling tactics and repeated blaming of carriers for delays when they well knew that no merchandise had been delivered to the carriers.

In the Catron transaction (Count One) and Rivers Boat Mart transaction (Count Three) funds were advanced by the Spokane and Eastern Branch of Seattle-First National Bank on spurious bills of lading.[9] In the Dana transaction (Count Two) no bill of lading was submitted to the bank and no funds were advanced by the bank. Instead a sight draft was accompanied by an invoice describing 15 boats, although Dana testified that it was his understanding with the Bolens that sight drafts would be accompanied by bills of lading. In any event the Bolens received the proceeds of the sight draft drawn on Dana knowing that the goods described in the invoices had not been shipped.

We may assume that appellants intended at some future date to fill the various orders by supplying boats and did not intend to deprive their customers permanently of money or property.[10] If they intended, however, to obtain money by means of false representations or promises, this is sufficient to show the required criminal intent, even though they intended to repay or make delivery later. Certainly the jury could reasonably find beyond a reasonable doubt that appellants were acting in furtherance of a scheme to obtain money through the use of spurious bills of lading and other documents when they knew they were not entitled to it.[11]

■ Appellants' defenses of good faith and lack of criminal intent were clearly for the jury.[12] The fraud is not based upon a promise or representation with respect to the future delivery of boats,[13] but rather upon the presentation to the bank for transmittal to customers of sight drafts, accompanied by spurious documents, for the present purpose of obtaining money, when the property described in the documents had not been delivered to the carriers.

■ Use of the mails may be established circumstantially or by proof of general custom.[14] The sight drafts, bills of lading, and invoices in question were all received in evidence without objection. Mr. Kearns testified in detail regarding

9. The name of the carrier was printed at the top of each of these bills of lading, indicating that the forms had been supplied by the carrier.

10. It is true also, as appellants argue, that there is no evidence that the Bolens profited personally from any of the transactions. They received no salary and only small payments on their indebtedness. They lost their own savings in an unsuccessful venture. There is evidence that they were unable to obtain an adequate supply of fiberglass. These facts in themselves, however, do not negative a scheme or intent to defraud. They could properly be taken into consideration by the trial court in imposing sentence. Presumably this was done since probation was granted.

11. See Le More v. United States, 5 Cir. 1918, 253 F. 887, a somewhat compara-

ble case involving the issuance of bills of lading without delivery of goods.

12. See Northcraft v. United States, 8 Cir. 1959, 271 F.2d 184, 187.

13. The cases involving sales of stock, upon which appellants rely, are factually distinguishable. Those cases recognize that promises with respect to the value or future of stock, if made in good faith, are not criminal, however visionary, attractive and persuasive the promises may be. Even in those cases, however, the question of good faith is often for the jury. See Hawley v. United States, 10 Cir. 1943, 133 F.2d 966, 971.

14. See Corbett v. United States, 8 Cir. 1937, 89 F.2d 124, 127; United States v. Shavin, 7 Cir. 1961, 287 F.2d 647, 652.

the instruments involved in Count Three. His testimony may properly be construed as illustrative of the manner in which all of the sight drafts and other instruments were transmitted by the bank. This testimony was sufficient to sustain the verdict insofar as use of the mails was concerned.

Judgment affirmed.