**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Sandor REGNER, Defendant-Appellant.**

No. 80–1462.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 8, 1981.

Decided May 19, 1982.

William H. Randall, Culver City, Cal., for defendant-appellant.

Brad D. Brian, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before KENNEDY, ANDERSON and FERGUSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Regner appeals from his conviction under 18 U.S.C. § 1341 for mail fraud. We affirm.

In February, 1974, Regner purchased a health insurance policy from the CNA Insurance Company of Chicago, Illinois. Five months later, Regner, an American citizen, travelled to his native Hungary. Upon his return to this country, he submitted a claim to CNA based on alleged hospitalization in Hungary. Regner stated in that claim that an injury sustained in a taxicab accident placed him in a Hungarian hospital from July 26 to August 10, 1974.

The insurance company requested documentation of Regner's claim. Regner had his insurance agent send CNA bills from the Gyor County Hospital in Romand, Hungary. After numerous demands from Regner and his attorney, CNA mailed Regner a check for $3,600 in satisfaction of his claim.

In February, 1980, Regner was indicted on one count of mail fraud, 18 U.S.C. § 1341. A jury trial ensued, and Regner was found guilty.

On this appeal, Regner raises the following issues: (1) that the district court abused its discretion by admitting certain evidence

of Regner's prior insurance claims because the evidence was irrelevant, that inquiry about the prior insurance claims was beyond the scope of direct examination of Regner, and that the district court should have given a contemporaneous limiting instruction upon admission of the evidence; (2) that the district court abused its discretion in granting defendant a continuance limited to five weeks while defendant had requested a six-months' continuance; and (3) that the admission of certain certified foreign public documents violated defendant's Sixth Amendment right to confrontation of witnesses. None of the above contentions merit reversal of Regner's conviction. We therefore affirm.

## I. Evidence of Regner's Prior Insurance Claims and Benefits

On cross-examination of Regner, the Government was permitted, over Regner's objections, to inquire into Regner's historical claims for and receipt of various insurance benefits. Regner proposes three errors regarding this inquiry. He argues that evidence of his past insurance claims was irrelevant, that such questioning exceeded the scope of direct examination and, once admitted, the district court erred by not giving a limiting instruction to the jury.

Regner's claim of irrelevance is founded upon Fed.R.Evid. 401, 402, and 403, especially the latter which provides that all relevant evidence is to be admitted unless "its probative value is substantially outweighed by the danger of unfair prejudice, ... or misleading the jury...." Regner argues that any probative value of evidence of his prior insurance claims was outweighed by the prejudice that resulted from its receipt,

that the evidence cast Regner as a "scourge upon society" in the eyes of the jury.

■ The trial court's determination under Fed.R.Evid. 403 is to be given great deference and this court will reverse only when there is an abuse of discretion. *United States v. Larios,* 640 F.2d 938, 941 (9th Cir. 1981), and cases cited therein. The district court admitted the inquiry for the limited purpose of rebutting Regner's testimony on direct exam to the effect that he lacked knowledge of filing insurance claims. The Government argued for admissibility also on the grounds that the evidence was probative of prior similar acts, presumably under Rule 404(b) as proof of motive, intent, plan, etc., However, the district court, in a sidebar conference, reserved judgment upon the admissibility of the inquiry under 404(b), and apparently was never called upon to provide a specific determination of that question. We will reserve judgment on that issue as well.

■ At least to the extent that the evidence was probative of Regner's credibility regarding his testimony that he was unfamiliar with insurance claims, we find no abuse of discretion in admitting this inquiry. For this same reason, we must reject Regner's argument that the examination of Regner's prior insurance claims was beyond the scope of his direct examination.[1] The examination was related to and probative of Regner's familiarity with filing insurance claims, an inquiry directly related to Regner's credibility. The district court did not abuse its discretion. *See United States v. Carlson,* 423 F.2d 431, 440 (9th Cir.), *cert. denied,* 400 U.S. 847, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970).

---

1. On direct examination, Regner was questioned about the filing of the CNA claim for the alleged injuries sustained in the taxi accident in Hungary:

"Q. Did you give Mr. Bomka [the insurance agent] or anybody else your son's doctor bills, your hospital bill and tell them it was your hospital bill?
A. I give Mr. Bomka all the papers, all the doctor bills, my son's and mine, because I don't know who I supposed to send the bill, you know, for the hospital bill."

On cross-examination, Regner was again asked:

"Q. Now, when you came back from Hungary, you testified that Mr. Bomka filled out all the insurance claims and you just signed, is that right?
A. Yes.
Q. Were you very familiar with insurance claims?
A. No.
Q. Had you filed any insurance claims in the past?
MR. RANDALL [Counsel for Regner]: Objection, your honor, irrelevant.
THE COURT: No. You may answer.
THE WITNESS: Yes, I filed."

Regner also claims that the district court erred in not giving an immediate instruction to the jury which would have informed them of the limited admissibility, for credibility purposes, of the evidence of Regner's prior insurance claims. This argument fails for a number of reasons. First, a district court is not required to give a limiting instruction to the jury unless counsel requests one. Fed.R.Evid. 105; *United States v. Drebin*, 557 F.2d 1316, 1325 (9th Cir. 1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978), *reh. denied*, 438 U.S. 908, 98 S.Ct. 3127, 57 L.Ed.2d 1150 (1978). During the sidebar conference initiated by defense counsel's objections to the admissibility of evidence of Regner's prior insurance claims, defense counsel only requested that the record reflect that the evidence was being introduced for a limited purpose. Defense counsel did not request a limiting instruction at that time, and the court acknowledged that the record reflected the limited admissibility. In addition, any failure to give a limiting instruction in the absence of the request does not rise to "plain error" under the circumstances of this case. *Cf. Drebin, supra,* at 1325.

Finally, Regner fails to demonstrate that he was prejudiced by the court's failure to give the limiting instruction. When ruling on defense counsel's objections to the admissibility of the inquiry into the past insurance claims, the district court declared in open court that "[t]he matter is material because of the defendant's earlier testimony about seeming lack of knowledge of filing insurance claims, and only for that purpose am I allowing it in." R.T. at 122. We do not suggest that the court's response to counsel's objection would suffice as a limiting instruction where a specific request for such is made. However, under the circumstances of the trial in this case, the court's statement stood as a limiting admonition of sorts and serves to weaken Regner's claim of prejudice from the lack of any limiting instruction. Moreover, Regner's guilt was established by evidence independent of the

evidence of the prior insurance claims. As will be set forth more fully below, the Government's evidence indicated that Regner had sent CNA fictitious hospital records and a receipt which was not for his own medical treatment, but for his stepson's. Such evidence was in and of itself sufficient to support the jury's verdict.

## II. The Continuance

Regner argues that the district court erred in not granting his April 10, 1980, request for a six-month continuance, receiving instead a continuance for only five weeks—to May 28, 1980. Regner claims that under the circumstances of this case, especially the fact that much of the prosecution's evidence was derived in Hungary and, consequently, attempts to interview Government witnesses would be met with delay in obtaining visas, etc., that the district court abused its discretion in granting less than the continuance requested. We disagree.

As for the suggestion that defense counsel needed the full continuance in order to contact and interview Hungarian witnesses, defense counsel conceded at the hearing on the continuance motion that he could probably accomplish those objectives in less time than the six months he had requested. Supp. R.T. at 3.

In addition, defense counsel never requested a further continuance of the trial date. At no time did defense counsel inform the district court that he had been unable to obtain evidence from Hungary or that he had been unable to obtain a visa. The record indicates that, until the guilty verdict was returned, Regner was content to be tried on May 28, 1980. Regner cannot now claim that he was prejudiced by proceeding to trial on that date.

## III. Confrontation Issues

Regner acknowledges that authenticated foreign public documents are admissible through a combination of Fed.Rules of Evid. 803(10) and 902(3),[2] yet he argues for

---

**2.** Rules 803(10) and 902(3) read as follows:
   "*Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial*

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

the first time on this appeal that his Sixth Amendment right to confrontation of witnesses was violated by the admission of certain foreign public documents at his trial.[3] Usually, errors not raised below will not be considered on appeal unless the proper resolution is beyond any doubt or where "injustice might otherwise result." *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), quoting *Hormel v. Helvering*, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). *See also, Jaffe v. Alexis*, 659 F.2d 1018, 1022 (9th Cir. 1981), and *Michael-Regan Co., Inc. v. Lindell*, 527 F.2d 653 (9th Cir. 1975). While we recognize that this court may discretionarily review questions not raised in the district court, *Singleton, supra*, we

\* \* \* \* \* \*

(10) *Absence of public record or entry.* To prove the absence of a record, report, statement, or data compilation, in any form, or the nonoccurrence or nonexistence of a matter of which a record, report, statement, or data compilation, in any form was regularly made and preserved by a public office or agency, evidence in the form of a certification in accordance with rule 902, or testimony, that diligent search failed to disclose the record, report, statement, or data compilation, or entry.

Rule 902. *Self-Authentication*

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

\* \* \* \* \* \*

(3) *Foreign public documents.* A document purporting to be executed or attested in his official capacity by a person authorized by the laws of a foreign country to make the execution or attestation, and accompanied by a final certification as to the genuineness of the signature and official position (A) of the executing or attesting person, or (B) of any foreign official whose certificate of genuineness of signature and official position relates to the execution or attestation or is in a chain of certificates of genuineness of signature and official position relating to the execution or attestation. A final certification may be made by a secretary or embassy or legation, consul general, consul, vice consul, or consular agent of the United States, or a diplomatic or consular official of the foreign country assigned or accredited to the United States. If reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of official documents, the court may, for good cause shown, order that they be treated as presumptively authentic without final certification or permit them to be

decline to do so here because Regner fails to convince us that a clear violation of the Confrontation Clause existed and sufficient evidence is presented in the record to support Regner's conviction regardless of any assumed prejudicial admission of the foreign public documents. These observations require further elaboration.

Regner would have this court believe that even though the documents were prepared by the certified custodian of records of the agencies involved, that although the officials declared that they were authorized under the laws of Hungary to attest to the genuineness of records maintained by the particular agencies, and even though these documents were accompanied by a final cer-

evidenced by an attested summary with or without final certification.

3. Over Regner's objections, the Government offered three certified Hungarian public documents at trial. Each document was accompanied with an English translation and the signatures of the public officials who executed the documents were certified as genuine by the Vice Consul of the United States Embassy in Budapest, Hungary. The district court admitted the documents presumably under Fed.Rules of Evid. 803(10) and 902(3). As mentioned, Regner does not now contest the admissibility of the documents under the Fed.Rules of Evidence.

One document had been prepared by the superintendent of official records of Fovarosi Autotaxi Vallalat, the state-owned taxicab company of the Hungarian People's Republic. The document certified that the company is required by law to maintain records of all accidents involving taxis and that "a diligent search" failed to disclose any record of a taxi accident involving Regner.

The deputy head physician of the Gyor County Hospital supplied the second document. It certified that the hospital is required by law to maintain records of all persons hospitalized there and that a diligent search of the records had failed to produce any indication that Regner was hospitalized from July 26 to August 10, 1974. Further, the document certified that no official hospital records corresponded to the treatment records which defendant had submitted to the insurance company.

The final document was also from the deputy head physician of the Gyor County Hospital. It certified that services were performed on defendant's stepson and paid for by Regner. The certificate explained that Regner's name appeared on the bill as the payer, not the recipient, of the treatment described on the bill.

tificate executed by an American Embassy official, that the substance of the documents should be suspect because of the "possible motives of communist Hungarian officials to fabricate documents affecting the rights of an ex-Hungarian citizen." Regner's Brief at 25. The record, however, is devoid of any evidence that the particular Hungarian officials harbored any ill will against Regner or that they were biased or prejudiced against him or would be motivated to prepare false documents. Without such facts, we are in no position to conclude that every document executed by public officials of communist countries is a fabrication and presumptively unreliable. Regner has simply failed to prove to this court that the admission of the foreign public documents in this case was beyond doubt a violation of his Sixth Amendment right of confrontation.

■ Likewise, no clear prejudice or injustice resulted from the admission of the documents. Even if we were to concede that a Confrontation Clause violation was present, sufficient evidence was presented by the Government at trial, unrelated to the foreign public documents, that would support the jury's guilty verdict under 18 U.S.C. § 1341. Regner himself admitted in his testimony that he had not been hospitalized in the Gyor County Hospital, although the evidence showed that he had submitted a claim to CNA accompanied by documents purporting to be evidence of his hospitalization at the facility. The evidence also suggested that Regner submitted his stepson's Gyor County Hospital bill as his own. These facts provided probative evidence of

Regner's fraudulent representation to CNA that he had been hospitalized in Romand, Hungary, from July 26, 1974, to August 10, 1974, as charged in paragraph 2 of the indictment. The Government, in closing arguments, adequately and properly informed the jury that a violation of the mail fraud statute could be demonstrated by this single false representation of hospitalization,[4] and the court properly instructed the jury that they could convict Regner on this evidence alone.[5]

We, therefore, find no basis for reversal of Regner's conviction and, accordingly,

AFFIRM.

FERGUSON, Circuit Judge, dissenting:

The majority accepts a rule of evidence that, if given wider application, will have devastating consequences for Americans who encounter legal difficulties while travelling abroad for business or pleasure. Under the majority's analysis, an authenticated document that a foreign state labels as a public record can be admitted in our courts without the foundation necessary for admitting business records. In a country such as Hungary, where the state controls numerous activities that would be characterized as private here, virtually all documents assume a public label. As a consequence of that fact and today's holding, a vast array of so-called public records become admissible in our courts without the proof required for the business records exception to the hearsay rule—proof by the custodian of records or other qualified witness that the record was made in the regular course of business and that it was the

---

4. The closing argument included the following:
    "And, ladies and gentlemen, you don't have to rely only on those hospital certificates to return a guilty verdict against Mr. Regner. You can rely on the defendant Sandor Regner's testimony, his own testimony. He admitted to you yesterday when he testified that he was not hospitalized at the County of Gyor Hospital. He said he was treated, that he received some treatment over there and stayed in some doctor's home, but he admitted that he was never in that hospital. And yet, he submitted the phony hospital records to the CNA Insurance Company."

Closing Argument of prosecution. RT at 221–22.

5. The pertinent excerpt from the district court's instructions reads:
    "The indictment in this case alleges several false and fraudulent representations. It is not necessary for the Government to prove each and every false representation alleged to have been made. Rather, to establish the existence of the scheme to defraud charged, it is only necessary that the proof show beyond a reasonable doubt that the defendant made, or caused to be made one false representation."

regular practice of the business to make the record.

This very case illustrates the harm that is possible when a foreign business document is admitted against a criminal defendant upon the flimsy foundation condoned by the majority. Mr. Regner has been convicted through the introduction of a document purporting to show the absence of a "public" record in the files of a Hungarian taxicab company. This document was introduced to prove that Regner never suffered an accident in Hungary. We know nothing about record keeping in Hungary. Are we to believe that a Hungarian taxicab company, by virtue of the label "public," is gifted with a reliability and omniscience that we would never presume to exist in its private counterpart in our own country?

I see no reason to relax the foundational requirements for the records of a Hungarian taxicab company, especially since there is no reason to suppose that the indicia of reliability are stronger for such "public" records than for the private records of American businesses.

### I.

By referring to the proposition that errors not raised below will not be considered on appeal, the majority attempts to justify its failure to address the issue of the admissibility of the Hungarian "public" records under the Federal Rules of Evidence. However, that proposition has no application to the instant case, since Regner's counsel did object to the admissibility of the document in the district court. Over counsel's relevancy, lack of foundation, and hearsay objections, the court admitted a certified document from the Hungarian People's Republic indicating that a search

made of Fovarosi Autotaxi Vallalat disclosed no record of a taxi accident involving Regner. Thus, counsel made specific and timely objections to the admission of the evidence below. Furthermore, the objections are sufficient to call into question the applicability of the Federal Rules of Evidence, because only by some possible application of those rules could the evidence objected to have been admitted as an exception to the hearsay rule and without the foundation required for business records.

On appeal, Regner continued to argue that the admission of the foreign documents was reversible error, raising for the first time the Confrontation Clause issue. I find it curious that the majority avoids the hearsay and foundation issues actually raised below by so readily accepting the statement in Regner's brief that authenticated foreign public documents are admissible through a combination of Fed.R.Evid. 803(10) and 902(3). This court is not bound by the counsel's view of the matter. Indeed, the question presented is a purely legal one that is for a court to decide. We are obligated to disregard counsel's concessions if they are incorrect.

### II.

The district court admitted the documents into evidence under Fed.R.Evid. Rules 803(10)[1] and 902(3)[2]. The former rule is an exception to the hearsay exclusion. At trial, Regner contested its applicability to the document here in issue. That question is discussed at length *infra*. The latter rule affords a mechanism for the admission of public documents. Regner has not challenged its application in this case.[3]

---

1. For the text of Rule 803(10), see Majority Opinion, *ante*, at note 2.

2. For the text of Rule 902(a), see Majority Opinion, *ante*, at note 2.

3. Two points must nonetheless be made about Fed.R.Evid. 902(3). First, it is derived from Fed.R.Civ.P. 44(a)(2). *See* Advisory Committee's Note to Rule 902(3) of Proposed Federal Rules of Evidence, 51 F.R.D. 315, 454 (1971).

That fact proves important to many of the cases in succeeding sections which arise under Fed.R.Civ.P. 44(a)(2).

Second, compliance with Rule 902(3) will shortly no longer be necessary because the United States has recently ratified by treaty the Convention Abolishing the Requirement of Legalization for Foreign Public Documents. *See* J. Weinstein & M. Berger, 5 *Weinstein's Evidence* ¶ 902(3a)[01] at 28 (1980 Supp.).

In order to appreciate the applicability of Rule 803(10) to the documents, it is necessary also to understand the operation of Rules 803(6), 803(7), and 803(8).[4]

## A. Rules 803(6) and 803(8).

Both Rule 803(6) and Rule 803(8) allow the admission of what would otherwise be inadmissible hearsay testimony.[5] The former admits into evidence records of regularly conducted business activities. *See, e.g., United States v. Sand*, 541 F.2d 1370, 1376–77 (9th Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 553 (1977) (bank records admitted against criminal defendants). The latter admits records of public offices or agencies. *See, e.g., United States v. Hudson*, 479 F.2d 251 (9th Cir. 1972), *cert. denied*, 414 U.S. 1012, 94 S.Ct. 377, 38 L.Ed.2d 250 (1973) (Selective Service file admitted as sole evidence sus-

taining criminal conviction). The difference in operation between the two is that 803(6) requires the "testimony of the custodian or other qualified witness," J. Weinstein & M. Berger, 4 *Weinstein's Evidence* ¶ 803(6)[02] at 803–151 through –152 (1979), while 803(8) does not require any foundational testimony, *id.* ¶ 803(8)[01] at 803–191.

## B. Rules 803(7) and 803(10).

The existence of a record is evidence that the matter recorded therein occurred. When a duty to record certain matters exists, the non-existence of a record is evidence for the converse proposition, i.e. that the matter about which there is no report did not occur. *See* 5 Wigmore, *Evidence* § 1633 at 624 (Chadbourn rev. 1974). The Federal Rules of Evidence[6] accordingly provide exceptions to the hearsay rule for

---

4. Rules 803(6), 803(7), and 803(8) provide as follows:

> *Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial*
>
> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \*     \*     \*     \*     \*     \*
>
> (6) *Records of regularly conducted activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
>
> (7) *Absence of entry in records kept in accordance with the provisions of paragraph (6).* Evidence that a matter is not included in the memoranda reports, records, or data compilations, in any form, kept in accordance with the provisions of paragraph (6), to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and preserved, unless the sources of information

or other circumstances indicate lack of trustworthiness.

> (8) *Public records and reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

5. Rules 803(6) and 803(8) are reproduced in footnote 1, *supra.* Rule 803(6) derives from 28 U.S.C. § 1732. *See* Advisory Committee's Note to Rule 803(6) of Proposed Federal Rules of Evidence, 51 F.R.D. 315, 426 (1971). Rule 803(8) is an expansion upon 28 U.S.C. § 1733. *See* J. Weinstein & M. Berger, 4 *Weinstein's Evidence* ¶ 803(8)[01] at 803–190 (1979).

6. Even before the Federal Rules of Evidence were adopted, this circuit allowed the hearsay exceptions later codified as Rules 803(7) and 803(10). *See United States v. De Georgia*, 420 F.2d 889, 892–94 (9th Cir. 1969), *overruling Shreve v. United States*, 77 F.2d 2, 7 (9th Cir. 1935), *cert. denied*, 296 U.S. 654, 56 S.Ct. 380, 80 L.Ed. 466 (1936).

evidence showing the absence of business or public records. Rule 803(7) allows evidence of the nonoccurrence of a matter that would normally be recorded under 803(6), while Rule 803(10) allows such evidence with regard to what would ordinarily be recorded under 803(8).[7] Advisory Committee's Note to Rule 803(10) of Proposed Federal Rules of Evidence, 51 F.R.D. 315, 431 (1971).

Since Rule 803(10) is based on Rule 803(8), evidence submitted thereunder need not be supported by testimony as to the nature of recordkeeping. Likewise, since 803(7) is based on 803(6), such testimony is required before evidence may be received thereunder. *See* 4 *Weinstein's Evidence, supra,* ¶ 803(7)[01] at 803–187. *Cf. United States v. Rich,* 580 F.2d 929, 938–39 (9th Cir.), *cert. denied,* 439 U.S. 935, 99 S.Ct. 330, 58 L.Ed.2d 331 (1978); *United States v. De Georgia,* 420 F.2d 889, 895–96 (9th Cir. 1969) (Ely, J., concurring).

### IV.

With the preceding understanding of the setting in which Rule 803(10) operates, I now consider the record from Fovarosi Autotaxi Vallalat, the state-owned taxicab company, introduced against defendant in this case.

In the American context, the records of a taxicab company would be admissible as business records under Rule 803(6) or 803(7). *Cf. United States v. De Georgia, supra,* 420 F.2d at 895–96 (business records admitted from auto rental company's computer). They would not be admissible under 803(8) or 803(10), as they are not public records within the meaning of those rules.

The Hungarian People's Republic and the United States of America enjoy markedly different political/economic systems. There is no overt distinction in Hungary between government's acting in its official and the government's acting in its proprietary capacities. Hungarian corporations are arms of the state; employees of corporations are to that extent government em-

ployees. The prosecution successfully urged below that because each cab driver in Budapest or Romand is an employee of the state, all taxi records are official records admissible under Rule 803(8) and 803(10). I cannot so blithely accept that syllogism.

### A. *Rule 803(10) Should Not Lightly Be Expanded.*

Nothing in the language of or Advisory Committee Note to exceptions 803(6), 803(7), 803(8), or 803(10) indicates that their application to foreign documents was explicitly considered. Nonetheless, courts regularly admit foreign documents pursuant to these exceptions. Case-support exists for the admission under Rule 803(6) of foreign business documents, *e.g., United States v. Sand, supra,* 541 F.2d 1370, 1376–77 (9th Cir. 1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 553 (1977) (Swiss bank records), the admission under Rule 803(8) of official foreign documents, *e.g., United States v. Grady,* 544 F.2d 598, 604 (2d Cir. 1976) (records of Royal Ulster Constabulary); *United States v. Rodriguez Serrate,* 534 F.2d 7 (1st Cir. 1976) (Dominican identification card, birth certificate, military records, death certificate, passport records, and demographic registry); *United States v. Pacheco-Lovio,* 463 F.2d 232 (9th Cir. 1972) (Mexican birth certificate); *United States v. Wing,* 450 F.2d 806, 810–12 (9th Cir. 1971), *cert. denied,* 405 U.S. 994, 92 S.Ct. 1267, 31 L.Ed.2d 462 (1972) (Mexican government border documents); *United States v. Ghaloub,* 385 F.2d 567, 571 (2d Cir. 1966) (Syrian census records), and the admission of certifications by a foreign government that the official documents do not contain a specified record, *e.g., United States v. D'Agostino,* 338 F.2d 490 (2d Cir. 1964) (no record from Italian Registrar of Vital Statistics that marriage annulled); *United States v. Blum,* 329 F.2d 49 (2d Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045 (1964) (declaration that Swiss consular records contained no record of watch movements).

---

**7.** Rule 803(7) is reproduced in note 4, *supra.* For the text of Rule 803(10), see Majority Opinion, *ante,* at note 2.

The foregoing government document cases deal with foreign government action of an official rather than a proprietary nature.[8] The census reports, birth certificates, consular records, border documents, and other foreign documents admitted under Rules 803(8) and 803(10) would all be official documents even were they recorded in the American context. By contrast, the taxicab certificate of the instant case would not be considered official had it been prepared in the United States.

Past practices, therefore, indicate only that foreign documents which would be official documents if prepared in the United States are admissible under 803(8) or 803(10). No guidance with respect to the documents underlying Regner's conviction—documents which would not be "official" if prepared here—is afforded by the case law.

Congress, however, has provided some guidance relevant to the disposition of this case. Because no witness subject to cross-examination need testify to the regularity of recordkeeping in the case of official records admitted under 803(8) or 803(10), it is difficult to attack the veracity of those records. That predicament may work unfair hardship to criminal defendants. Congress therefore expressed reluctance to use Rule 803(8) in criminal cases to expand prior practice concerning the public records hearsay exception. 4 *Weinstein's Evidence, supra,* ¶ 803(8)[01] at 803–189. Congress' solicitude for the rights of criminal defendants is striking when the reluctance to expand 803(8), which admits public records, and hence the reluctance to expand 803(10), which admits evidence of the absence of a public record, is seen against the general background of Rule 803. The Rule is designed in all other respects to expand hearsay exceptions, *id.* ¶ 803(6)[03] at 803–156.

Because acceptance of the taxicab record would require expansion of Rule 803(10), and because Congress has expressed a reluctance to expand Rule 803(10) against criminal defendants, the following discussion would hold the document inadmissible under that rule.

B. *The Taxi Records Should Be Treated As Business Records.*

The fact that in the Hungarian system taxi drivers are employees of the state need not, it seems to me, control decisions as to the admissibility of documents of the Hungarian taxicab company. The evidence rules distinguish between business records and public documents. It is not at all obvious to me that the policy of that distinction is served by blindly applying the label "public" to documents routinely generated by a commercial enterprise which happens to be "owned" by a foreign state.

The proponent of records from an American taxi company would have to present as a witness the company's custodian of records or other qualified official to testify to the trustworthiness of the company's recordkeeping. In the words of the Advisory Committee:

The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part

---

8. The distinction between government acting in its proprietary and its sovereign capacities is well settled in the law, although it has not escaped criticism. *E.g., Owen v. City of Independence,* 445 U.S. 622, 644 & n.26, 100 S.Ct. 1398, 1412 & n.26, 63 L.Ed.2d 673 (1980). As far back as 1824, Chief Justice Marshall stated:

It is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself. . . .

*Bank of the United States v. Planters' Bank of Georgia,* 9 Wheat. (22 U.S.) 904, 907, 6 L.Ed. 244 (1824). *See Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 695–96, 96 S.Ct. 1854, 1861–62, 48 L.Ed.2d 301 (1976) (Opinion of White, J.) (collecting citations).

This court has relied on the distinction while recognizing its limitations. *See United States v. Georgia-Pacific Co.,* 421 F.2d 92, 100 & n.17 (9th Cir. 1970).

of a continuing job or occupation. McCormick §§ 281, 286, 287. . . .

Advisory Committee's Note to Rule 803(6) of Proposed Federal Rules of Evidence, 51 F.R.D. 315, 426–27 (1971). Had the prosecution furnished a witness to offer foundational testimony concerning the "systematic checking," "regularity and continuity," and "habits of precision" of the taxi records, there would have been no problem with admitting them into evidence.

But that course was not followed below. Rather, the prosecution offered the taxi documents as public records. The justification for the official records exemption from the hearsay rule "is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Advisory Committee's Note to Rule 803(8), id. at 429. In comparing this justification to that offered above for Rule 803(6), it appears that both business records and public records have high indicia of trustworthiness.[9] Nonetheless, the assurances of accuracy are usually greater for public records than for business entries. See 4 Weinstein's Evidence, supra, ¶ 803(8)[01] at 803–191. That disparity explains why official records can be admitted under Rule 803(8) without the subscribing testimony required for business records under Rule 803(6). See id.

Congress has directed that the Federal Rules of Evidence "be construed to secure . . . development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Fed. R.Evid. 102. See United States v. Robinson, 544 F.2d 110, 114–15 (2d Cir. 1976), cert. denied, 434 U.S. 1050, 98 S.Ct. 901, 54 L.Ed.2d 803 (1978). That goal would not be furthered here by admitting the taxicab records as official documents.

The most fitting label for a taxi company, be it communist or capitalist, American or Hungarian, is a business. Therefore, I am willing to presume that the Romand taxi

driver performs his duty to file accident reports with no lesser punctiliousness than his Los Angeles counterpart and, accordingly, I would be prepared to admit the proffered document as a business record. But I cannot accept that the Romand taxi driver is so sure to perform his duty properly that no foundational testimony is needed to support the admission of documents against an American criminal defendant, at the same time that the rules of evidence do not place similar confidence in the Los Angeles taxi driver. In short, I am not satisfied, in the absence of testimony from any Hungarian custodian of records, that the assurances of accuracy are greater for these "public" records than they would be for Los Angeles taxi records.

I would hold that the district court committed error in admitting those records under 803(10).

C. *The Error in Admitting the Taxi Records as Official Records Requires Reversal.*

Had the taxi certificate been properly admitted under 803(7), rather than improperly under 803(10), foundational testimony would have been required. See 4 Weinstein's Evidence, supra, ¶ 803(7)[01] at 803–187. The failure to offer such testimony is grounds for excluding the evidence. See N. L. R. B. v. First Termite Control Co., Inc., 646 F.2d 424, 427–30 (9th Cir. 1981). In First Termite Control, even though a witness testified in support of the challenged document's admission, her insufficient knowledge concerning recordkeeping rendered cross-examination meaningless. The document was therefore inadmissible and the judgment consequently could not stand.

In order to determine whether an error in a criminal proceeding is harmless or demands reversal, we apply the standards formulated in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). See United States v. Ford, 632 F.2d 1354, 1375 n.22 (9th Cir. 1980), cert. denied, 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369

---

**9.** However, even if all other formal requirements are met, both 803(6) and 803(8) nonetheless exclude records if the sources of information or other circumstances indicate lack of trustworthiness.

(1981); *Bushaw v. United States*, 353 F.2d 477, 481 (9th Cir. 1965), *cert. denied*, 384 U.S. 921, 86 S.Ct. 1371, 16 L.Ed.2d 441 (1966). *Kotteakos* demands reversal in this case if we are left with "grave doubt" as to whether the erroneous admission of the taxicab record had a "substantial influence" on the verdict or if we cannot say "with fair assurance ... that the judgment was not substantially swayed by the error." 328 U.S. at 765, 66 S.Ct. at 1248. Application of those standards to the instant case mandates reversal of Regner's conviction.

The preceding section demonstrates that the taxicab record was improperly admitted into evidence. The only remaining evidence concerning the occurrence or non-occurrence of the alleged automobile accident is Regner's uncontroverted assertion that the accident took place. No evidence remains from which the jury could have inferred that Regner misrepresented the fact that he was involved in an automobile accident.

It is true that even after striking the taxicab document, the record still would contain evidence that Regner had his agent send to his insurance company a hospital bill for services performed not on Regner but on his stepson. Moreover, to sustain a conviction under 18 U.S.C. § 1341, the Government need prove only one act of wilful misrepresentation. *United States v. Halbert*, 640 F.2d 1000, 1008 (9th Cir. 1981). Nonetheless, Regner's conviction should not be affirmed on this basis. The gravamen of the indictment against Regner was not that Regner mailed an erroneous hospital bill, but rather that Regner "falsely represented [that his medical expenses] were caused by an automobile accident in Hungary." The five subcounts of the indictment make repeated references to the allegation that the automobile accident was fictitious. These subcounts mention the allegedly false representation of hospitalization only once, and then only in conjunction with the charge of falsifying the automobile accident.

Accordingly, even if sending an erroneous hospital bill to one's insurance company could qualify as mail fraud under 18 U.S.C. § 1341, I am far from confident that this issue was fully presented to the jury or that the jury could have reached a judgment on that basis.[10] The evidence remaining in the record after striking the erroneously admitted taxicab record would indicate that Regner had been involved in an automobile accident, had been treated by a doctor subsequent thereto, and had sent his insurance company his stepson's hospital bill rather than his own medical bill. This evidence, though consistent with a scheme to defraud, is also consistent with an innocent mistake. Accordingly, I cannot be confident that the jury would have found that Regner acted with criminal intent, a finding requisite to conviction under § 1341. *See United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979); *Bolen v. United States*, 303 F.2d 870, 875 (9th Cir. 1962).

The standards enumerated in *Kotteakos, supra*, preclude a finding that the error in admitting the taxicab record was harmless. *Cf. Clark v. City of Los Angeles*, 650 F.2d 1033, 1038–39 (9th Cir. 1981) (admission of document under business document exception was reversible error, and court did not need to decide whether substantial evidence supported the verdict); *Lindsey v. Craven*, 521 F.2d 1071 (9th Cir. 1975).

### V.

The Supreme Court has recognized that the Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, the Sixth Amend-

---

**10.** Once again, the standard for reversible error set forth in *Kotteakos* is pertinent:

> The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

328 U.S. at 765, 66 S.Ct. at 1248. I am troubled that the majority has overlooked the *Kotteakos* standard in concluding that even if no Confron-

tation Clause violation were present, sufficient evidence existed to support the jury's verdict. Although evidence may have existed to support the jury's verdict, I am hardly convinced that that evidence was the basis for the jury's verdict. Because inadmissible evidence may well have infected the verdict, I would hold, in light of the *Kotteakos* standard, that there was reversible error.

ment establishes a rule of necessity that requires face-to-face confrontation—the *sine qua non* for cross-examination—except where the hearsay declarant is unavailable. Second, the Confrontation Clause continues to operate once it has been demonstrated that the witness is unavailable. "Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), *quoting Snyder v. Massachusetts*, 291 U.S. 97, 101, 54 S.Ct. 330, 78 L.Ed. 674 (1934).

Before the testimony of an unavailable witness can be admitted, it must possess "indicia of reliability." As *Roberts* explains,

> The Court has applied this "indicia of reliability" requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the "substance of the constitutional protection." ... This reflects the truism that "hearsay rules and the Confrontation Clause are generally designed to protect similar values," ... and "stem from the same roots," .... It also responds to the need for certainty in the workaday world of conducting criminal trials.
>
> ... Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

448 U.S. at 66, 100 S.Ct. at 2539 (citations and footnotes omitted).

In the present case no hearsay declarant was available for defendant to cross-examine. Therefore, only if the evidence admitted as an exception to the hearsay rule demonstrated "indicia of reliability" would there be no material departure from the reason of the Confrontation Clause.

First, this is not a case where reliability can be inferred because the evidence falls within a firmly rooted hearsay exception. As I have already explained in Part IV above, the hearsay exception codified in Rule 803(10) does not apply to the certification used in this case to prove that Mr. Regner's alleged taxicab accident never occurred.

Second, the very way in which the evidence was admitted precluded a showing of "particularized guarantees of trustworthiness." The recordkeeping procedures of the Hungarian taxicab service were unknown to the district court, and are unknown to this court. Relevant information about those procedures could have been obtained through the testimony, subject to cross-examination, of a custodian of the records or other qualified witness. Yet Regner was denied an opportunity to cross-examine a witness familiar with the company's records.

It must be remembered that no record was produced of Regner's having been in a taxi accident. Rather, a document was submitted into evidence certifying that no such record exists. It was thus vitally important for Regner to ascertain what recordkeeping and search techniques the Hungarian taxi company followed. For if he could have demonstrated lapses in its system, he might have reconciled the absence of any record with the occurrence of the alleged accident. Regner had need of an opportunity to demonstrate that the recordation procedures of the Fovarosi Autotaxi Vallalat were inadequate, *cf. United States v. Orozco*, 590 F.2d 789, 794 (9th Cir.), *cert. denied*, 442 U.S. 920, 99 S.Ct. 2845, 61 L.Ed.2d 288 (1979); *Gibbs v. State Farm Mutual Ins. Co.*, 544 F.2d 423, 428 (9th Cir. 1976), or that a diligent search of its records was not appropriately undertaken, *cf. United States v. Robinson, supra*, 544 F.2d 110, 114–15 (2d Cir. 1976), *cert. denied*, 434 U.S. 1050, 98 S.Ct. 901, 54 L.Ed.2d 803 (1978).

I conclude that the unwarranted expansion of a hearsay exception, used in this case to admit evidence lacking indicia of

reliability, violated the defendant's rights under the Confrontation Clause.

## VI.

The taxicab certificate introduced against Regner qualified for admission only as a business record under Fed.R.Evid. 803(7) and the foundational testimony required by that Rule was lacking. Moreover, in this case, the admission of hearsay evidence that lacked the necessary indicia of reliability violated defendant's right of confrontation. On these two grounds I would reverse defendant's conviction and remand to the district court.